STATE OF NEBRASKA, APPELLEE, V. JACK G. IRONS, APPELLANT.
574 N.W. 2d 144

Filed February 20, 1998.    No. S-96-1120.

Robert B. Creager, of Anderson, Creager & Wittstruck, P.C., for appellant.

Don Stenberg, Attorney General, and Mark D. Starr for appellee.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

WRIGHT, J.

## NATURE OF CASE

Jack G. Irons was charged with the sale of unregistered securities, in violation of Neb. Rev. Stat. § 8-1104 (Reissue 1991). Irons moved to quash the information, alleging that § 8-1104 is unconstitutional. A jury was waived, and after making findings of fact and conclusions of law, the district court found Irons guilty. Irons was sentenced to 1 to 3 years' imprisonment.

## SCOPE OF REVIEW

Statutory interpretation is a matter of law, in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the decision made by the courts below. *State v. Schultz*, 252 Neb. 746, 566 N.W.2d 739 (1997).

A challenge to the constitutionality of a statute presents a question of law, which must be determined by the Nebraska Supreme Court independently from the conclusion reached by the trial court. *State v. Sommerfeld*, 251 Neb. 876, 560 N.W.2d 420 (1997).

## FACTS

The "Friends Network" (Network) was a variation of pyramid sales wherein the participants made "gifts" to other participants above them in the pyramid. A participant had to recruit others to join the pyramid in order to progress to a place in the pyramid where that participant would receive gifts. Once a participant had received $12,000 in gifts, the pyramid would split. The participant was then required to leave the first pyramid and start again at the bottom of a new pyramid if he or she so chose. Each participant was required to bring at least one additional person into the Network, although the participants were asked to bring in more than one.

Irons was a participant in the Network, having made gifts to other participants. Irons also acted as a manager of various gifting lists. He contracted with other participants to manage their participation and charged a $1,000 fee to anyone who reached the top of the gifting list and received gifts.

Maria Christian testified that she first met Irons through Rick Carson, a business acquaintance who was a participant in the Network. Carson took Christian to Irons' office, where Irons explained the Network to her. According to Christian, Irons told her that he had learned of the Network through one of the women in his office, was impressed by it, and had inquired about the possibility of his managing the Network. Christian stated she understood that the $1,500 she would give to Irons was not going to him but to an individual at the top of the list.

Christian testified that she knew from the presentation and the literature that in order to receive gifts through the Network,

she would have to actively recruit other participants to fill the bottom row of the chart. However, Irons told her that if she had difficulty in getting participants, two women in his office would be available to make telephone calls. Irons gave Christian a business card, assuring her that he would meet with her prospective recruits at any time to help her progress in the Network. Irons explained to Christian that either he or one of the women in his office would contact her periodically to inform her of her status in the Network. When Christian questioned Irons about the legality of the Network, he responded that the authorities in another state had challenged it and that its legality had been established. Christian eventually declined to participate in the Network.

Chad Schmidt testified that he participated in the Network at the solicitation of a coworker, Andy Rinquest. Irons managed Rinquest's list and told Schmidt that the more people he could recruit, the faster he would move up toward the top of the pyramid. However, Irons suggested that if Schmidt had trouble finding recruits, others on the list would have a motive to help him fill in the slots. Irons told Schmidt he gave no guarantees about moving up, but suggested that others might be willing to buy out Schmidt's slot if he was having difficulty recruiting. Schmidt said he knew that his $1,500 gift went to Carson, not Irons, and that he understood that Irons would collect his $1,000 fee only if Schmidt moved to the top of the list and Schmidt received gifts. Irons gave Schmidt his business card and directed Schmidt to check in with him every couple of days in order to get an update on the Network.

In addition to the preliminary hearing testimony which was offered at trial with the consent of the parties, the State offered evidence from an undercover police officer who had been assigned to investigate the matter. This officer and another officer had a conversation with Irons in which Irons disclosed that once the person at the top of the pyramid received his or her $12,000, Irons would take $1,000 from the total for his operating expenses. The officer said that he was led to understand that the investors on the bottom tier were responsible for bringing in at least one additional person and that the more they brought in, the more quickly he would progress through the Network.

The officer had taped his conversations with Irons, and during the first conversation, Irons indicated that 300 people were involved at the time and that the Network had been going for only a week or so. Irons told the undercover officers that he was trying to manage the Network at his business, assigning spots and keeping track of participants' progress up the charts. When asked whether the Network was legal, Irons explained that it was not a pyramid. Irons distinguished the Network from a pyramid scheme on the basis that a pyramid goes on indefinitely, whereas once the top person in this Network reaches payout, the scheme begins anew.

The officers returned to Irons' business on the afternoon of July 29, 1994, and were told by Irons that he had decided to stop taking the $1,000 fee and was going to turn over the responsibility for maintaining the lists to the person at the top of each list. After giving Irons $1,500 for participation, one of the officers informed Irons of his real identity, to which Irons responded: "Yeah[,] I know exactly where you're from."

Irons was convicted under § 8-1104 of offering for sale or selling an unregistered security. He appeals his conviction and sentence. We affirm.

## ASSIGNMENTS OF ERROR

Irons makes five assignments of error: (1) The district court erred in concluding that guilty knowledge or intent to deceive or harm was not an element of the criminal offense of selling unregistered securities; (2) the evidence was insufficient to support a finding that Irons was guilty beyond a reasonable doubt of each of the material elements of the offense; (3) the district court erred in excluding from the trial evidence that Irons did not have knowledge that the Network was a security subject to registration; (4) Irons' conviction of a Class IV felony and sentence to imprisonment, without proof or a finding of criminal intent or intent to deceive, violated his constitutional rights under the 8th and 14th Amendments of the U.S. Constitution and article I, §§ 3 and 9, of the Nebraska Constitution; and (5) Irons' sentence was excessive and an abuse of discretion.

## ANALYSIS

Irons first claims that some form of criminal intent is an element of § 8-1104 of the Securities Act of Nebraska. Section 8-1104 provides:

> It shall be unlawful for any person to offer or sell any security in this state, except securities exempt under section 8-1110 or when sold in transactions exempt under section 8-1111, unless such security is registered by notification under section 8-1105 or by coordination under section 8-1106 or by qualification under section 8-1107.

Neb. Rev. Stat. § 8-1117 (Reissue 1997) states in part:

> (1) Any person who willfully violates any provision of sections 8-1101 to 8-1124 except section 8-1113, or who willfully violates any rule or order under the provisions of sections 8-1101 to 8-1124, or who willfully violates the provisions of section 8-1113 knowing the statement made to be false or misleading in any material respect shall be guilty of a Class IV felony.

Statutory interpretation is a matter of law, in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the decision made by the courts below. *State v. Schultz*, 252 Neb. 746, 566 N.W.2d 739 (1997). Therefore, we review the interpretation of the statutes in question independent from the decision made by the district court.

In overruling Irons' motion to quash, the district court ruled that the evidence as to lack of knowledge or criminal intent was not relevant. Therefore, Irons urges us to revisit our decision in *State v. Fries*, 214 Neb. 874, 337 N.W.2d 398 (1983), contending that *Fries* is inconsistent with more recent pronouncements by this court regarding the criminal intent required in any felony prosecution.

In *Fries*, we held that a specific intent need not be proved to sustain a conviction under the fraud provisions of the Uniform Securities Act. The defendant in that case contended that the trial court had failed to properly instruct the jury with regard to the intent the State had to prove as an element of the offense and

incorrectly instructed with regard to the definition of "willfully." He argued that proof of a specific intent to violate the law was required in order to convict. We stated that while state statutes typically require some element of scienter for criminal conviction, under the Uniform Securities Act as adopted by the various states, this is usually expressed by reference to "willful" violations. We noted that several courts have expressly held that proof of a specific intent, evil motive, or knowledge that the law was being violated is not required to sustain a criminal conviction under a state's "blue sky" laws. We held that to sustain a conviction under either the fraud or registration provisions of the Uniform Securities Act, specific intent need not be proved, and that "willful" may mean no more than that the actor was aware of what he was doing. We see no reason to revisit our holding in *Fries*, and we decline to do so.

Irons also claims that even if the proper standard is "willfully," he did not act willfully because he did not know or have reason to believe that the Network was an investment contract and, therefore, a security within the purview of the Securities Act of Nebraska. In *State v. Sheets*, 94 N.M. 356, 610 P.2d 760 (N.M. App. 1980), a case relied upon by this court in *Fries*, the court rejected the defendant's contention that in order to commit the crime of selling unregistered securities, one must have knowledge that the item being sold is in fact a security. The court stated that to commit a violation of the state securities act, the violation must be willful, meaning that the defendant "acted intentionally in the sense that he was aware of what he was doing." 94 N.M. at 366, 610 P.2d at 770. According to the *Sheets* court, penalties for willful violation do not require knowledge that the item is a security.

In this case, it is apparent that Irons was aware that he was offering or selling the right to participate in a multilevel chain distribution gifting program. The fact that he did not know that this participation was legally classified as a "security" indicates only that Irons did not act with specific intent or knowledge that he was violating the law. Knowledge by a defendant that the item sold is a security is not required in order to convict under the registration provisions of the Uniform Securities Act. There is no requirement that the defendant purposely intended to vio-

late the law in order to be convicted. See *State v. Fries, supra.* Accordingly, we find Irons' argument to be without merit.

We next address Irons' position that there was insufficient evidence that a security was involved and that, therefore, he was not properly convicted of the unlawful sale of a security. The district court found that the positions on the Network were investment contracts and therefore securities. Irons argues that the positions on the Network cannot be classified as investment contracts because each participant was required to recruit others and that, therefore, the expectation of profits would not be derived from the managerial efforts of others. Irons relies on the definition of an "investment contract" set forth in *S. E. C. v. Howey Co.*, 328 U.S. 293, 66 S. Ct. 1100, 90 L. Ed. 1244 (1946), wherein the Court stated that an investment contract is one where a person is led to expect profits solely from the efforts of the promoter or a third party.

At the time of Irons' alleged offense, a security was defined as, among other things, an "investment contract." See Neb. Rev. Stat. § 8-1101(13) (Cum. Supp. 1994) (definition now found at Neb. Rev. Stat. § 8-1101(15) (Reissue 1997)). However, an "investment contract" was not defined by the Securities Act of Nebraska. The district court, in holding that the positions on the network were investment contracts, adopted the *Howey Co.* definition, but concluded that the word "solely" was not to be interpreted literally and that the reasonable expectation of profits did not have to be arrived at solely from the managerial efforts of others.

We summarized the factors that define an investment contract in *State v. Jones*, 235 Neb. 1, 4-5, 453 N.W.2d 447, 451 (1990), as being whether there was "(1) an investment (2) in a common enterprise (3) with a reasonable expectation of profits (4) to be derived from the entrepreneurial or managerial efforts of others." In *Jones*, we recognized that in interpreting the Securities Act of Nebraska, Neb. Rev. Stat. § 8-1122 (Reissue 1997) encourages reference to federal law and the law of other states that have adopted the Uniform Securities Act.

Other courts have noted that the *Howey Co.* test could be readily circumvented by adding a requirement that the buyer contribute some minimal effort. In *Securities & Exch. Com. v.*

*Koscot Inter., Inc.*, 497 F.2d 473 (5th Cir. 1974), the court stated that when considering whether something is a security, substance should take precedent over form lest the statutory policy of protecting investors be thwarted. In *Webster v. Omnitrition Intern., Inc.*, 79 F.3d 776 (9th Cir. 1996), the court adopted a flexible approach that focuses on whether the efforts made by those other than the investor are undeniably significant ones. Under various modified *Howey Co.* tests, several courts have specifically held that pyramid schemes involve investment contracts despite the fact that an investor's profits are in part contingent upon his or her successful efforts in recruiting new investors. See, e.g., *Securities & Exch. Com'n v. Glenn W. Turner Enter., Inc.*, 348 F. Supp. 766 (D. Or. 1972).

We agree with the above rationale, and therefore, we find no merit to Irons' position. In *Jones*, we eliminated the requirement set forth in *Howey Co.* that the profits must be derived solely from the entrepreneurial or managerial efforts of others. See, also, *Reves v. Ernst & Young*, 494 U.S. 56, 110 S. Ct. 945, 108 L. Ed. 2d 47 (1990).

The facts in this case show that an investor's expectation of profits was derived from the managerial efforts of Irons, and the district court found that Irons' managerial efforts were important acts in the success of the Network. Irons managed the lists that moved investors to the top of the pyramid and set up new lists to continue the scheme. He distributed the gifts from new members to the person at the top of the pyramid and collected a $1,000 managerial fee from that person once all of his or her gifts had been received. Irons met with prospective investors to explain how the Network worked and, if needed, assisted members in finding new recruits. Therefore, we conclude that the evidence was sufficient to support the finding that the Network involved investment contracts, which are securities under the Securities Act of Nebraska.

Irons next claims that § 8-1101(13), which defines what is or is not a security subject to regulation, is unconstitutionally vague as applied in this case. Although the statute defines a security as, among other things, an "investment contract," Irons argues that since the term "investment contract" is not defined by the statute, a person of ordinary intelligence would not know

that obtaining a slot within the Network involved an investment contract. Irons asserts that a person of ordinary intelligence would not have a reasonable opportunity to know what conduct is prohibited. Given the definition of an "investment contract" described above, Irons claims that the provisions of § 8-1104 have been unconstitutionally applied to him under the facts of this case. Although the district court found that § 8-1104 was neither vague nor overbroad, we must determine the constitutionality of the statute independently from the conclusion reached by that court. See *State v. Sommerfeld*, 251 Neb. 876, 560 N.W.2d 420 (1997).

We first address standing and the tests involved in a challenge to a statute as being unconstitutionally vague. To have standing to assert a claim of vagueness, a defendant must not have engaged in conduct which is clearly prohibited by the questioned statute and cannot maintain that the statute is vague when applied to the conduct of others. *State v. Roucka*, 253 Neb. 885, 573 N.W.2d 417 (1998); *State v. Carpenter*, 250 Neb. 427, 551 N.W.2d 518 (1996). The test for determining whether a statute is vague is whether it forbids or requires the doing of an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and may differ as to its application. *State v. Sommerfeld, supra*; *State v. Schmailzl*, 243 Neb. 734, 502 N.W.2d 463 (1993). A statute will not be deemed vague if it uses ordinary terms which find adequate interpretation in common usage and understanding. *State v. Sommerfeld, supra*. The statute must be examined in light of the conduct with which the defendant is charged. *Id*. The test is whether the defendant could reasonably understand that his conduct was proscribed by the statute. *State v. Schmailzl, supra*.

A person of ordinary intelligence must have a reasonable opportunity to know what is prohibited by a statute or what conduct will render him liable for punishment. See *Howard v. City of Lincoln*, 243 Neb. 5, 497 N.W.2d 53 (1993). Under § 8-1101(13), the term "security" is defined as "any note, stock, treasury stock, bond [or] investment contract." As mentioned, it is therefore clear that an investment contract is a security. The question is whether the term "investment contract" is so vague that persons of common intelligence must necessarily guess at its meaning and may differ as to its application.

Irons contends that no reasonable person could ascertain that participation in the Network was an investment contract required to be registered as a security before being offered for sale and that this vague provision of the law has been arbitrarily and capriciously used to turn a misdemeanor deceptive trade practice violation into a felony securities fraud case. In *State v. Brewer*, 932 S.W.2d 1 (Tenn. Crim. App. 1996), the court addressed a similar argument that the absence of a statutory or common-law definition of an investment contract rendered the security code unconstitutionally vague. The defendant argued that the trial court erred in refusing to dismiss the indictment on the ground that the Tennessee Securities Act was unconstitutionally ambiguous. The court stated there was no question that an investment contract was a security, but that a question remained as to what constituted an investment contract. Implicit in the court's holding that the absence of a statutory definition of "investment contract" did not render the code vague was the fact that the definition of an investment contract has been in existence in case law since at least *S. E. C. v. Howey Co.*, 328 U.S. 293, 66 S. Ct. 1100, 90 L. Ed. 1244 (1946).

In *Howey Co.*, the Court, interpreting § 2(1) of the Securities Act of 1933, now codified at 15 U.S.C. § 77b(1) (1994), proffered the following definition: "[A]n investment contract . . . means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . . ." *Howey Co.*, 328 U.S. at 298-99. As noted by the Tennessee Court of Criminal Appeals in *Brewer*, in subsequent years, the *Howey Co.* test has been criticized by both courts and scholars as being too rigid and, thus, easily circumvented. As already discussed herein, the criticism concerned *Howey Co.*'s requirements that profits be derived "solely" from the efforts of others and that a common enterprise had to exist. Subsequently, in *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852, 95 S. Ct. 2051, 44 L. Ed. 2d 621 (1975), the Court explained: "The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." The language requiring the profits to come solely from the

efforts of others was deleted. Case law from other state and federal courts has thus focused on the significance of the efforts of others and has rejected the idea that such efforts must be exclusive.

More important to our analysis here, however, is that in *State v. Jones*, 235 Neb. 1, 453 N.W.2d 447 (1990), by eliminating the "solely" language found in *Howey Co.*, this court defined an investment contract so as to apply to pyramid schemes such as the one in this case. We conclude that the statutes in question are not vague and that Irons could reasonably understand that his conduct was proscribed by the statute. See *State v. Schmailzl*, 243 Neb. 734, 502 N.W.2d 463 (1993). *Jones* and numerous cases from other jurisdictions gave notice to Irons that his conduct was proscribed by law. Therefore, Irons lacks standing to challenge the statute on vagueness grounds.

Irons next argues that the sale of pyramid chain distribution schemes is governed exclusively by the Uniform Deceptive Trade Practices Act, specifically Neb. Rev. Stat. § 87-302(a)(12) (Reissue 1994), and that, therefore, he has been convicted under the wrong statute. Irons contends that a violation of the Uniform Deceptive Trade Practices Act is prosecutable as a misdemeanor and that under Nebraska law, where two statutes are in conflict, the more specific or special provision governs.

The district court held that criminal prosecutions for chain distribution schemes were not limited to prosecution under § 87-302. We agree. In *State v. Null*, 247 Neb. 192, 526 N.W.2d 220 (1995), both a bribery statute with a misdemeanor provision and a bribery statute with a felony provision were in effect. We held that the prosecutor was free to choose the statute under which to prosecute so long as the selection was not deliberately based on any unjustifiable standard such as race, religion, or other arbitrary classification. Although there are two statutes governing Irons' actions, one defining a misdemeanor and the other a felony, they are not conflicting. Thus, the prosecution was free to choose the statute under which to prosecute unless the decision was deliberately based upon an unjustifiable standard. We find no merit to Irons' argument.

Finally, Irons argues that his sentence was excessive. It is the duty of an appellate court to disturb a sentence on appeal which

was within the statutory limits only if the sentence imposed was an abuse of judicial discretion. *State v. Riley*, 242 Neb. 887, 497 N.W.2d 23 (1993). Judicial abuse of discretion means that the reasons or rulings of the trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition. *Id*. The sentence imposed upon Irons was well within the statutory limits and was not an abuse of discretion. Although Irons did not originate the scheme, his managerial efforts, for which he received a fee, were essential to the continued life of the scheme. We cannot say that the sentence of 1 to 3 years' imprisonment was an abuse of discretion.

The judgment of conviction and sentence are affirmed.

AFFIRMED.