State of Nebraska, appellee, v.
Robert Faber, appellant.
647 N.W.2d 67

Filed June 28, 2002. No. S-01-893.

Bradley C. Easland, of Johnson, Morland & Easland, P.C., for appellant.

Don Stenberg, Attorney General, and Marilyn B. Hutchinson for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

McCORMACK, J.

## I. NATURE OF CASE

Robert Faber was charged by information in the district court for Madison County with knowing and intentional child abuse

pursuant to Neb. Rev. Stat. § 28-707(1) and (4) (Cum. Supp. 2000). After a bench trial, Faber was found guilty of said charge and received an indeterminate sentence of 24 to 28 months' imprisonment. On appeal, Faber challenges the constitutionality of § 28-707(1)(a) as applied to the facts of his case. This case also presents the issues of whether a search warrant was supported by probable cause, whether the evidence was sufficient to find Faber guilty of the charged offense, and whether the sentence he received was excessive.

## II. BACKGROUND

Jimsonweed is a plant that grows in the eastern and midwestern regions of the United States. Each plant bears pods containing seeds, with each pod containing 50 to 100 seeds. Jimsonweed is an anticholinergic poison containing four active toxins: atropine, scopolamine, hyoscyamine, and nitrates. Although jimsonweed has some medical uses when used in small dosages, it can be toxic to humans and other animals.

When ingested, jimsonweed begins breaking down into its component toxins and begins to produce a number of harmful effects on the human body. Those portions of the central nervous system that regulate heart rate become severely impaired, resulting in a rapid increase in heart rate up to the point of cardiac arrest. Body temperature is also impaired, potentially causing hypothermia. Jimsonweed can also produce respiratory failure and can have significant effects on the digestive system. Specifically, jimsonweed slows down the processes in the digestive and urinary systems, resulting in a slow expulsion of the ingested jimsonweed from the individual and, thus, prolonged exposure to the toxins. Individuals who have ingested jimsonweed also experience an inability to focus their eyes because of dilation of the pupils and an inability to talk because of a lack of saliva in the mouth. Jimsonweed also produces a hallucinogenic effect in individuals. The confusion, poor judgment, and disorientation produced by jimsonweed can last for up to 2 weeks after ingestion.

At Faber's trial, the State presented the testimony of S.B., who was a minor at the time. S.B. testified that on an occasion prior to November 12, 2000, Faber approached her and asked if

she would help Faber find people to buy jimsonweed pods from him. Eventually, S.B. and a friend ingested some of the jimsonweed seeds, causing them to become ill. S.B. later informed Faber that the seeds had made her sick, and she told Faber that he should no longer sell them. Faber replied that S.B. should have ingested more seeds than she had actually consumed.

On November 12, 2000, 15-year-old J.W. went with two friends, C.B. and C.S., also minors, to S.B.'s apartment in Norfolk, Nebraska, for the purpose of obtaining jimsonweed pods. At the apartment, J.W., C.B., and C.S. met Faber, who offered to sell several pods to J.W. for $5. Because he did not have the proper change to complete the transaction, J.W. was initially unwilling to buy any pods. This prompted Faber to offer to leave and get change for J.W. Upon returning to the apartment with the change, Faber sold three pods to J.W. Faber also instructed J.W., C.B., and C.S. how to consume the jimsonweed. Faber said that the seeds should first be separated from the stem and leaves and then should be swallowed whole, along with something to drink. Faber did not instruct them about how many seeds should be consumed at one time. Because J.W. was then on probation for a juvenile offense and subject to drug tests, Faber also told J.W. that the jimsonweed would not produce a positive drug test. Faber told J.W. that the jimsonweed would produce a "really, really hard trip." The word "trip" is often used to refer to hallucinations and other effects produced by jimsonweed.

Approximately 45 minutes to 1 hour after leaving S.B.'s apartment, J.W., C.B., and C.S. arrived at J.W.'s home. J.W. then ingested the seeds from one of the jimsonweed pods as previously instructed by Faber, while C.B. and C.S. also ingested seeds. J.W. passed out soon after taking the seeds. When he awoke, J.W. testified that his face was "beet red" and that he could not stand up because his legs were not functioning properly. He further testified that he could not talk, think, eat, or drink; that he "walked into things"; and that he "missed doorknobs and things." He also stated that he could not recognize his parents when he saw them. J.W. did not remember being taken to the hospital.

J.W.'s mother testified that when she returned home, she found "puke all over my kitchen, everywhere." She found J.W. lying on the couch and observed that he was "not coherent at

all." His pupils appeared to be "bigger than the color of his eyes," and he was very aggressive, leading her to remove any sharp objects from his control to prevent him from injuring himself. She testified that when she held J.W., his body temperature was very hot. J.W.'s parents had difficulty trying to take J.W. to the hospital because J.W. repeatedly would take his clothes off in an effort to cool down.

One of the doctors who treated J.W. at the hospital testified that upon admission to the hospital, J.W.'s heart rate was escalated, his pupils were dilated, and he was confused and "not really with the program." J.W. was diagnosed as suffering from an anticholinergic reaction. The doctors testified that, to a reasonable degree of medical certainty, J.W.'s physical safety was endangered as a result of his ingestion of the jimsonweed. J.W. remained in the hospital for 4 days.

While investigating another case in the area involving jimsonweed, Investigator David Bos of the Norfolk Police Division became aware of J.W.'s case. The investigation eventually led law enforcement to Faber, and on December 5, 2000, a search warrant was issued for Faber's apartment. At the apartment, police confiscated several items, including a plastic bag containing 84 jimsonweed pods.

On December 8, 2000, Faber was arrested pursuant to an arrest warrant and was transported to the Norfolk Police Division. At the police station, Faber was interrogated by Bos. Bos began the interrogation by identifying himself and reading Faber his *Miranda* rights. Faber signed a rights waiver form indicating that he understood his rights. Faber then requested the services of an attorney. Bos promptly terminated the interview and left the room to arrange for Faber's transport to jail. Bos returned to the interview room and informed Faber that he would be taken to jail. Faber then began indicating that he did not want a lawyer and was willing to talk to Bos. Bos replied he was not allowed to continue the interrogation because of Faber's request for a lawyer. After Faber made several more requests to talk to Bos, Bos again reviewed the rights waiver form with Faber. Faber indicated that he understood his rights and that he wanted to proceed without an attorney.

During the interrogation, Faber indicated that he was familiar with jimsonweed and had used it in the past, but had never sold it

to anyone. Faber did admit to giving it to friends in the past, but claimed he had stopped giving it away after one of his friends had gotten sick from using it. Faber described to Bos some of the hallucinogenic effects of jimsonweed, specifically comparing it to the effects produced by "acid." Faber also told Bos that he did not know J.W. However, Faber was able to recall an occasion at S.B.'s apartment where Faber gave, but did not sell, some jimsonweed to C.S. and two of C.S.'s friends, neither of whom Faber knew. Bos also confronted Faber with the fact that Faber's apartment had been searched 3 days earlier and that a bag containing jimsonweed had been discovered. Faber admitted that the bag was his.

An information was filed in district court charging Faber with knowing and intentional child abuse pursuant to § 28-707(1) and (4). On February 12, 2001, Faber filed a motion to quash the prosecution against him on the grounds that § 28-707(1) was unconstitutionally overbroad and vague, both on its face and as applied. On February 27, the district court overruled the motion to quash, citing *State v. Crowdell*, 234 Neb. 469, 451 N.W.2d 695 (1990). At his February 28 arraignment, Faber pled not guilty.

On April 4, 2001, Faber filed a motion to suppress all evidence seized during the search of his apartment, alleging that (1) the affidavit in support of the search warrant failed to state sufficient probable cause to believe the evidence sought would be found at the location described in the warrant; (2) the affidavit contained information that was "'stale'"; (3) statements were taken from Faber in violation of his *Miranda* rights and were involuntary, the products of inducements, threats, or promises, and should be suppressed according to *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964); (4) the affidavit in support of Faber's arrest warrant did not contain facts sufficient to establish probable cause for Faber's arrest on the charges of child abuse, and any evidence obtained from or following Faber's arrest, including any statements made by him, should be suppressed as fruit of the poisonous tree pursuant to *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). The district court subsequently overruled Faber's motion. After a bench trial, Faber was found guilty of knowing and intentional child abuse under § 28-707(1)(a) and (4). He was sentenced to 24 to 28 months' imprisonment.

### III. STANDARD OF REVIEW

■ Whether a statute is constitutional is a question of law; accordingly, this court is obligated to reach a conclusion independent of the decision reached by the court below. *In re Adoption of Baby Girl H.*, 262 Neb. 775, 635 N.W.2d 256 (2001).

■ A trial court's ruling on a motion to suppress evidence, apart from determinations of reasonable suspicion to conduct investigatory stops and probable cause to perform warrantless searches, is to be upheld on appeal unless its findings of fact are clearly erroneous. *State v. Ildefonso*, 262 Neb. 672, 634 N.W.2d 252 (2001). In making this determination, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses. *Id.*

■ When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Leonor*, 263 Neb. 86, 638 N.W.2d 798 (2002).

■ An appellate court will not disturb sentences within statutory limits, unless the district court abused its discretion in establishing the sentences. *Id.*

### IV. ASSIGNMENTS OF ERROR

Faber asserts that the district court erred in (1) overruling the motion to quash the information filed against him because § 28-707(1) and (4) are unconstitutionally overbroad and vague as applied to the facts of this case, (2) overruling the motion to suppress because the search warrant obtained by law enforcement was not supported by probable cause and because statements taken from Faber should have been suppressed as "fruit of the poisonous tree," (3) finding that there was sufficient evidence presented at trial to find Faber guilty of knowing and intentional child abuse, and (4) imposing an excessive sentence.

### V. ANALYSIS

#### 1. CONSTITUTIONALITY

Faber argues that the district court erred in overruling his motion to quash because § 28-707(1) and (4) are unconstitution-

ally overbroad and vague as applied to the facts of his case. Section 28-707 provides in relevant part:

> (1) A person commits child abuse if he or she knowingly, intentionally, or negligently causes or permits a minor child to be:
>
> (a) Placed in a situation that endangers his or her life or physical or mental health;
>
> . . . .
>
> (4) Child abuse is a Class IIIA felony if the offense is committed knowingly and intentionally and does not result in serious bodily injury as defined in section 28-109.

■ Although Faber now argues that § 28-707(4) is unconstitutional, his motion to quash in the district court challenged the constitutionality of only § 28-707(1). An appellate court will not consider an issue on appeal that was not presented to or passed upon by the trial court. *State v. Thomas*, 262 Neb. 138, 629 N.W.2d 503 (2001). Therefore, we limit our review to the constitutionality of § 28-707(1).

### (a) Overbreadth

■ As a general rule, in a challenge to the overbreadth and vagueness of a law, a court's first task is to analyze overbreadth. *State v. Hookstra*, 263 Neb. 116, 638 N.W.2d 829 (2002).

■ An attack on the overbreadth of a statute asserts that language in the statute impermissibly infringes on a constitutionally protected right. *State v. Sommerfeld*, 251 Neb. 876, 560 N.W.2d 420 (1997). A statute may be unconstitutionally overbroad only if its overbreadth is substantial, that is, when the statute would be unconstitutional in a substantial portion of the situations to which it is applicable. *State v. Sommerfeld, supra*; *State ex rel. Dept. of Health v. Jeffrey*, 247 Neb. 100, 525 N.W.2d 193 (1994).

Faber argues that § 28-707(1) reaches a substantial amount of constitutionally protected activity, citing a number of hypothetical situations which could constitute child abuse under § 28-707(1), but which he claims are generally without criminal fault or are constitutionally protected. However, "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984).

In *State v. Sinica*, 220 Neb. 792, 372 N.W.2d 445 (1985), a defendant challenged § 28-707(1)(b) (Cum. Supp. 1984) on overbreadth grounds. After finding that the term "cruelly punished," as used in § 28-707(1)(b), was clearly defined, we concluded that the defendant's overbreadth challenge must fail.

For the same reasons, Faber's overbreadth challenge fails. We have previously held that § 28-707(1)(a) has an easily and commonly understood meaning. *State v. Crowdell*, 234 Neb. 469, 451 N.W.2d 695 (1990). Section 28-707(1)(a) reaches only that activity which causes or permits a minor child to be placed in a situation that exposes the minor child's life or health to danger or the peril of probable harm or loss. *Id.* We reiterate here our pronouncement in *Sinica*: "Child abuse is not a constitutionally protected activity." *State v. Sinica*, 220 Neb. at 798-99, 372 N.W.2d at 449. Thus, the statute does not reach a substantial amount of constitutionally protected activity and, therefore, the overbreadth challenge is without merit.

(b) Vagueness

The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. *State v. Roucka*, 253 Neb. 885, 573 N.W.2d 417 (1998). The more important aspect of the vagueness doctrine is not actual notice, but the requirement that a legislature establish minimal guidelines to govern law enforcement. *State v. Sommerfeld, supra.*

To have standing to assert a claim of vagueness, a defendant must not have engaged in conduct which is clearly prohibited by the questioned statute and cannot maintain that the statute is vague when applied to the conduct of others. *State v. Irons*, 254 Neb. 18, 574 N.W.2d 144 (1998); *State v. Roucka, supra; State v. Severin*, 250 Neb. 841, 553 N.W.2d 452 (1996); *State v. Carpenter*, 250 Neb. 427, 551 N.W.2d 518 (1996); *State v. Kelley*, 249 Neb. 99, 541 N.W.2d 645 (1996). A court will not examine the vagueness of the law as it might apply to the conduct of persons not before the court. *State v. Beyer*, 260 Neb. 670, 619 N.W.2d 213 (2000). The test for standing to assert a

vagueness challenge is the same whether the challenge asserted is facial or as applied. *Id.*

Faber argues that he has standing to challenge § 28-707(1) on vagueness grounds because his conduct is not clearly prohibited by the statute. Faber characterizes his conduct as providing jimsonweed to J.W. and argues that because jimsonweed is not a controlled substance, his conduct is not clearly prohibited by the statute. However, Faber was not charged with distributing a controlled substance, but with knowingly and intentionally causing or permitting a minor child to be placed in a situation in which the minor child's life or health is exposed to danger or the peril of probable harm or loss.

In *Crowdell*, we rejected a facial challenge to § 28-707(1)(a), finding that the word "'endangers' means to expose a minor child's life or health to danger or the peril of probable harm or loss" and thus has an easily and commonly understood meaning. 234 Neb. at 474, 451 N.W.2d at 699. We conclude, therefore, that Faber's constitutional challenge for vagueness is without merit.

## 2. MOTION TO SUPPRESS

In his second assignment of error, Faber argues that the district court erred in not suppressing the evidence gathered during the search of his apartment. Faber claims that the affidavit in support of the search warrant was not supported by probable cause. Faber further claims that the affidavit failed to establish the reliability of several informants mentioned in the affidavit and that the affidavit relies upon stale information.

Suppression is an appropriate remedy if (1) the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his or her reckless disregard of the truth; (2) the issuing magistrate wholly abandoned his or her judicial role in the manner condemned in *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 99 S. Ct. 2319, 60 L. Ed. 2d 920 (1979); (3) the warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) the warrant is so facially deficient that the executing officer cannot reasonably presume it to be valid. *State v. Ildefonso*, 262 Neb. 672, 634 N.W.2d 252 (2001). If none of the

aforementioned circumstances exist, the evidence should not be suppressed. *Id.*

A search warrant, to be valid, must be supported by an affidavit which establishes probable cause. Probable cause sufficient to justify issuance of a search warrant means a fair probability that contraband or evidence of a crime will be found. *Id.*

In reviewing the strength of an affidavit as a basis for finding probable cause to issue a search warrant, we have adopted the " 'totality of the circumstances' " rule established by the U.S. Supreme Court in *Illinois v. Gates*, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). *State v. Detweiler*, 249 Neb. 485, 489, 544 N.W.2d 83, 88 (1996). The magistrate who is evaluating the probable cause question must make a practical, commonsense decision. The magistrate must determine whether, given the totality of the circumstances set forth in the affidavit, including the veracity of and basis of knowledge of the persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Id.* The question is whether the issuing magistrate had a " 'substantial basis' " for finding that the affidavit established probable cause. *Id.*

The affidavit in support of the search warrant for Faber's apartment was sworn to by Investigator Steven Mills of the Norfolk Police Division. The affidavit relies in part on information provided by a confidential informant and also on information provided by two other informants: Eric Lech and C.T. Faber argues that the affidavit fails to establish the reliability of the confidential informant and therefore, the information provided by the confidential informant may not be considered in determining whether probable cause existed. See *State v. Ortiz*, 257 Neb. 784, 600 N.W.2d 805 (1999). We assume, without deciding, that Faber's assertion is correct. However, not every defect in an affidavit renders the warrant defective or the seizure made pursuant to the warrant unconstitutional. *Id.* Although it may be necessary to excise certain matter from an affidavit, if the remainder of the affidavit is sufficient to establish probable cause, the warrant issued upon such remaining information in the affidavit will be proper and the results of the search pursuant to the warrant are constitutionally obtained. *Id.* We conclude that even after excising the information provided

by the confidential informant, the remainder of the affidavit contains sufficient evidence to establish probable cause.

As grounds for the search warrant, Mills averred:

2. That affiant is aware that [A.M.], D.O.B. 10/24/1982, was missing since November 19, 2000 from Madison County, Nebraska, and her vehicle that she was last reported driving was found in a ditch located in Stanton County, Nebraska.

3. That affiant is awarethat [sic] on December 2, 2000, a landowner, who was pheasant hunting, observed an unresponsive body lying in a pasture located in Stanton County, Nebraska. The landowner immediately called authorities. The body was located approximately ½ mile from where the missing persons vehicle was located.

4. That affiant was advised by Investigator Keith Janata of the Stanton County Sheriff's [office] that on December 2, 2000, at approximately 5:50 p.m., Investigator Janata had contact with Eric Lech and [C.T.]. Investigator Janata furhter [sic] advised that Eric and [C.T.] are friends of [A.M.] and they advised that they were with her on the night of November 19, 2000 and dropped her off at her car located in King's Lanes parking lot at approximately 1:00 a.m. on November 20, 2000.

5. Affiant was advised by Investigator Janata that Eric and [C.T.] both stated in written statements that they were present with [A.M.] when [A.M.] received two pods of Jimson Weed from Robert Faber who lives at the Kensington [Apartments] in Room #538 on November 19, 2000.

. . . .

7. Affiant was also advised by Investigator Janata Eric and [C.T.] advised him that another male subject, Jeremy Langenberg, was also present with [A.M.] inside Room #538 on November 19, 2000. Eric and [C.T.] stated that [A.M.] received the "Jimson Bud" from Robert Faber while inside Room #538 at the Kensington Apartments on November 19, 2000. Eric and [C.T.] also stated that Jeremy Langenbeg [sic] purchased "Jimson Bud" from Robert [Faber] while they were in Room #538.

. . . .

10. Investigator Janata also advised that [C.T.] stated to him [that] at approximately 11:00 p.m[.], she observed [A.M.] consume a palm full of the "Jimson Bud" seeds that she had received earlier from Robert Faber. Inv. Janata advised that he had asked [C.T.] if she had seen [A.M.] use any other drugs that night and she said "not that she had seen".

11. Affiant was advised advised [sic] by Investigator Janata that on December 4, 2000, he attended an autopsy that was conducted on [A.M.] Investigator Janata was informed by Dr. Robert Bowen, who conducted the autopsy, that there was no trauma to the body and no visual cause of death. Dr. Bowen provided Investigator Janata with approximately 25 Jimson seeds that were recovered from the stomach of [A.M.] Dr. Bowen advised Investigator Janata that blood and urine tests will be conducted to help determine the cause of death and the levels of Jimson Seed in [A.M.]'s system.

 When a search warrant is obtained on the strength of information from an informant, the affidavit in support of issuance of the warrant must set forth facts demonstrating the basis of the informant's knowledge of criminal activity and establish the informant's credibility, or the informant's credibility must be established in the affidavit through a police officer's independent investigation. *State v. Ildefonso*, 262 Neb. 672, 634 N.W.2d 252 (2001). The reliability of an informant may be established by showing in the affidavit to obtain a search warrant that (1) the informant has given reliable information to police officers in the past, (2) the informant is a citizen informant, (3) the informant has made a statement that is against his or her penal interest, or (4) a police officer's independent investigation establishes the informant's reliability or the reliability of the information the informant has given. *Id.* As a general rule, an appellate court is restricted to consideration of the information and circumstances found within the four corners of the affidavit. *State v. Ortiz*, 257 Neb. 784, 600 N.W.2d 805 (1999).

The district court found that Lech and C.T. were

citizen informants, close friends of [A.M.], whose motivation, identity and relationship to the case are immediately

apparent from the affidavit, and whose statements were given for the purpose motivated by good citizenship. In addition, their statements in the affidavit can be considered to be corroborated by the results of the autopsy conducted on December 4, 2000, on [A.M.], wherein 25 Jimson seeds were discovered in her stomach.

After-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review. A magistrate's determination of probable cause should be paid great deference by reviewing courts. *State v. Ildefonso, supra*; *State v. Detweiler*, 249 Neb. 485, 544 N.W.2d 83 (1996).

We do not determine if Lech and C.T. were citizen informants because the district court was not clearly erroneous in finding that their reliability was established by independent police investigation. The autopsy of A.M. indicated that she had ingested approximately 25 jimsonweed seeds prior to her death. This corroborates the information provided by Lech and C.T. They stated to police that they observed A.M. obtain two pods of jimsonweed from Faber at Faber's apartment and later, according to C.T., consume "a palm full" of the seeds that A.M. had received from Faber. Having established the reliability of Lech and C.T., we now consider Faber's argument that the information provided by Lech and C.T. was stale.

Proof of probable cause justifying issuance of a search warrant generally must consist of facts so closely related to the time of issuance of the warrant as to justify a finding of probable cause at that time. *State v. Ortiz, supra*. In general, no more than a reasonable time may have elapsed between the occurrence of facts and the issuance of a search warrant based thereon. *State v. Groves*, 239 Neb. 660, 477 N.W.2d 789 (1991). As the Eighth Circuit stated in *U.S. v. LaMorie*, 100 F.3d 547, 554 (8th Cir. 1996):

"There is no bright-line test for determining when information is stale. Whether the averments in an affidavit are sufficiently timely to establish probable cause depends on the particular circumstances of the case, and the vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit. Time factors

must be examined in the context of a specific case and the nature of the crime under investigation." . . . Where continuing criminal activity is suspected, the passage of time is less significant.

Where the affidavit recites a mere isolated violation, it would not be unreasonable to imply that probable cause dwindles rather quickly with the passage of time. However, where the affidavit properly recites facts indicating activity of a protracted and continuous nature—a course of conduct—the passage of time becomes less significant. *United States v. Johnson*, 461 F.2d 285 (10th Cir. 1972). See, also, *United States v. Tucker*, 638 F.2d 1292 (5th Cir. 1981) (primary consideration in evaluating staleness issue is whether affidavit describes single transaction or continuing pattern of criminal conduct).

Lech and C.T. advised police that they were inside Faber's apartment on November 19, 2000, and that while they were there, they observed Faber provide jimsonweed to two individuals. The affidavit was sworn to by Mills on December 5, 2000—16 days after Lech's and C.T.'s observations. The search warrant for Faber's apartment was issued and executed on December 5.

In addition to those portions of the affidavit recited above, Mills also averred:

12. Affiant is aware that on December 4, 2000, Investigator Janata had contact with Dr. Richard Bell[,] M.D. of Faith Regional West Campus. Dr. Bell advised Investigator Janata that the hospital has seen several cases of subjects coming into the Emergency Room feeling extremely ill and advising they had consumed Jimson seeds. Dr. Bell advised that Jimson seeds has [sic] had the effect of causing persons to be under the influence, to wander disoriented, and, often times, to disrobe.

We conclude that under the facts of this case, the information provided by Lech and C.T. 16 days prior to the issuance of the search warrant was not stale. The affidavit provided evidence of recurring activity of jimsonweed use by individuals and the harmful effects it produced. When combined with the assertion that jimsonweed was located in Faber's apartment, we cannot say the district court was clearly erroneous in finding that there

was a fair probability of finding jimsonweed in Faber's apartment at the time the search warrant was issued.

### 3. SUPPRESSION OF FABER'S STATEMENTS

Faber also argues that the district court erred in failing to suppress the statements Faber made to law enforcement. Faber argues that his statements were made after being confronted with evidence obtained during the purported illegal search of Faber's apartment and thus should be suppressed as " 'fruit of the poisonous tree' " under *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).

Faber's argument is without merit for two reasons. First, the search of Faber's apartment was valid, as stated above, and thus any statements produced by evidence obtained during that search are not "fruit of the poisonous tree." Furthermore, this argument is not properly before this court. In his motion to suppress filed in district court, Faber asserted, inter alia, that his statements were the product of his allegedly invalid *arrest* warrant. Faber now asserts that the statements were the product of an allegedly invalid *search* warrant. The district court never considered whether Faber's statements were the product of an allegedly invalid search warrant. When an issue is raised for the first time in an appellate court, it will be disregarded inasmuch as a lower court cannot commit error in resolving an issue never presented and submitted to it for disposition. *In re Adoption of Luke*, 263 Neb. 365, 640 N.W.2d 374 (2002).

### 4. SUFFICIENCY OF EVIDENCE

On appellate review, a criminal conviction must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Jackson*, 258 Neb. 24, 601 N.W.2d 741 (1999). When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Leonor*, 263 Neb. 86, 638 N.W.2d 798 (2002). On a claim of insufficiency of the evidence, an appellate court will not set aside a guilty verdict in a

criminal case where such verdict is supported by relevant evidence. Only where evidence lacks sufficient probative force as a matter of law may an appellate court set aside a guilty verdict as unsupported by evidence beyond a reasonable doubt. *Id.*

Faber was convicted of knowing and intentional child abuse under § 28-707(1)(a) and (4). This statute prohibits a person from knowingly and intentionally causing or permitting a minor child to be placed in a situation that endangers his or her life or physical or mental health and which does not result in serious bodily injury. The evidence presented by the State at trial is recounted above. We believe that evidence satisfies the essential elements of the crime of knowing and intentional child abuse beyond a reasonable doubt. The evidence is thus sufficient to support Faber's conviction.

### 5. EXCESSIVE SENTENCE

Faber's final assignment of error is that the district court abused its discretion in imposing a term of imprisonment of 24 to 28 months.

An appellate court will not disturb sentences within statutory limits, unless the district court abused its discretion in establishing the sentences. *State v. Leonor, supra.* An abuse of discretion takes place when the sentencing court's reasons or rulings are clearly untenable and unfairly deprive a litigant of a substantial right and a just result. *Id.*

In imposing a sentence, a sentencing judge should consider the defendant's age, mentality, education, experience, and social and cultural background, as well as his or her past criminal record or law-abiding conduct, motivation for the offense, nature of the offense, and the amount of violence involved in the commission of the crime. *Id.* In considering a sentence, a court is not limited in its discretion to any mathematically applied set of factors. *Id.*

The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observations of the defendant's demeanor and attitude and all of the facts and circumstances surrounding the defendant's life. *Id.*

Faber was found guilty of knowing and intentional child abuse not resulting in serious bodily injury. This offense is a Class IIIA felony, for which the maximum penalty is 5 years'

imprisonment, a \$10,000 fine, or both. There is no minimum penalty. Neb. Rev. Stat. § 28-105(1) (Cum. Supp. 2000). Thus, Faber's sentence was within the statutory limits.

At the sentencing hearing, the district court noted that Faber had received medical training in the past and that the evidence indicated Faber knew that jimsonweed was harmful. The court, based on its observation of Faber's demeanor and attitude and other facts surrounding his life, declined probation. The court determined that if placed on probation, Faber would likely engage in additional criminal activity and that probation would depreciate the seriousness of the offense. The district court did not abuse its discretion in sentencing Faber, and we therefore conclude that Faber's sentence was not excessive.

## VI. CONCLUSION

The judgment of the district court is affirmed.

AFFIRMED.

GERRARD, J., participating on briefs.