State of Nebraska, appellee, v.
David L. Archie, appellant.
733 N.W.2d 513

Filed May 25, 2007. No. S-05-1145.

Dennis R. Keefe, Lancaster County Public Defender, and Christopher Eickholt for appellant.

David L. Archie, pro se.

Jon Bruning, Attorney General, and Kimberly A. Klein for appellee.

WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ., and HANNON, Judge, Retired.

GERRARD, J.

David L. Archie, the appellant, was convicted of one count of first degree sexual assault on a child[1] and one count of incest[2] in connection with the sexual abuse of Archie's 6-year-old step-daughter. Archie was sentenced to 25 to 30 years' imprisonment for first degree sexual assault on a child, and a concurrent term

---

[1] See Neb. Rev. Stat. § 28-319 (Reissue 1995).

[2] See Neb. Rev. Stat. § 28-703(1) (Reissue 1995).

of 10 to 20 years' imprisonment for incest. Archie appeals. For the reasons that follow, we affirm the judgment of the district court.

## BACKGROUND

The victim in this case, D.W., was born January 20, 1998, and was 7 years old at the time of trial. Archie was born on August 6, 1969, and was 35 years old at the time of trial. Miranda S., D.W.'s mother, married Archie on February 14, 2004. Miranda had two other children, both boys, who were respectively 1 year old and 4 years old at the time of trial. Archie is the biological father of the younger boy, but not of the older boy or D.W.

In the summer of 2004, Miranda, Archie, and the three children were living together in a home in Lincoln, Nebraska. Miranda admitted that she and Archie "hadn't been getting along" for "quite a while that summer" and that she was not very happy with their marriage. Miranda was working morning shifts at a local restaurant, but Archie was not working at the time. Archie watched the children while Miranda was at work. D.W., then 6 years old, was in kindergarten.

At some point during the summer of 2004, D.W. told Miranda that " 'Daddy sexed with me,' " and that it hurt. "Daddy" was what D.W. called Archie. Miranda confronted Archie about D.W.'s statement, and Archie said that D.W. was lying. Some time later, D.W. made a similar claim. Miranda brought the matter up with Archie again and told Archie that they needed to have a conversation with D.W. because "this is serious, you know." The next day, D.W. told Miranda that she had been lying. However, Miranda testified that she had been to work that day, so Archie had the opportunity to talk to D.W. about the matter earlier. "[A] few weeks, maybe a month" later, Miranda and D.W. had another conversation with Archie. D.W. repeated to Archie everything she had said to Miranda. Miranda testified that Archie accused D.W. of lying and that D.W. responded, " 'No, Daddy, you're lying.' "

Because of what D.W. had said, Miranda took her to see Dr. Derrick Anderson, a family practitioner, on August 19, 2004. Miranda said that before taking D.W. to the doctor, she had examined D.W.'s genitals and concluded that D.W. "looked

a little red, like un-normal." Miranda testified that she "told [Anderson] that [D.W.] looked a little red down there, and that was it, pretty much, that she was just reddish. That's what she was being seen for."

Dr. Anderson observed D.W.'s vaginal area and saw mild redness and irritation, but no frank evidence of trauma. Anderson made external observations of D.W.'s vagina, but did not conduct an internal examination. Anderson discussed possible causes of the irritation with Miranda, including soaps and bubble baths, and suggested that if D.W. had any further problems, Miranda should bring D.W. back to be reevaluated.

On September 6, 2004, after Miranda came home from work, she, Archie, and the children went to a park. Eventually, they went home, and while Archie was playing basketball across the street, Miranda played with the children, then bathed D.W. Miranda noticed what appeared to be blood in D.W.'s underwear. Miranda asked D.W. if it was blood or if she had spilled Kool-Aid on herself. D.W. was reluctant to answer the question, and Miranda waited until D.W. was out of the bath to ask again. Miranda had a conversation with D.W. in D.W.'s bedroom and decided to make a doctor's appointment for D.W. Miranda told Archie about the situation, and according to Miranda, Archie replied that "it wasn't really necessary to make her [a doctor's appointment]. Kids fall all [the] time. He said his two older girls bumped and fall [sic], and they had blood in their panties before. It's — it was pretty much nothing to worry about." But the next day, Miranda made the doctor's appointment anyway.

The appointment was made for September 7, 2004, at 3 p.m., with Dr. Anderson. Miranda came home from work early that day, but according to Miranda, Archie determined that the doctor's appointment was less important than visiting an insurance company to obtain coverage so Miranda could get her driver's license reinstated. As a result, they missed the doctor's appointment. Miranda rescheduled the appointment for the next day, with Joan George, a nurse practitioner and physician's assistant. Miranda took D.W. to the rescheduled appointment. George spoke with D.W. while Miranda was out of the room, and after Miranda returned, George called the police.

George testified that she saw D.W. in the late afternoon on September 8, 2004, and "[t]he information on the schedule said that she had had blood in her panties." George conducted a physical examination of D.W. and noticed irritation that she thought was out of the ordinary. George testified that

> [u]sually, on a six-year-old, the folds of tissue over the vaginal opening are together. They're not apart. They're — kind of leaf over each other. Hers were separated a little bit and there was some redness. That can be a normal variance, but it also can be a result of some type of penetration.

George said she asked D.W., "'What do you think caused the bleeding, the blood in your panties?'" D.W. "said that Daddy put his wiener down there and it hurt and it caused the blood." George asked D.W. when it had happened, and D.W. said, "'When Mommy was at work on Monday.'" George asked D.W. how old she had been when this had first happened, and D.W. replied that she had been 5 years old. George said that D.W. did not seem to be afraid or in any acute physical distress and that D.W. was upset "[j]ust when she told me what had happened. She said that it hurt and she — you know, that that — she was upset." George said that when she told Miranda what D.W. had said, Miranda acted surprised. George consulted with Anderson, then contacted Child Protective Services, the Child Advocacy Center (Center), and the police.

After speaking on the telephone with a police officer, Miranda took D.W. to a police station, where she met Investigator Deanna Hager of the Lincoln Police Department, with whom she had spoken. The police referred Miranda to the Center, which Miranda described as "a place where children or young people go to when somebody sexually abuses them or hurts them in any way." Miranda and D.W. went to the Center, where they met Hager and a social worker from the Department of Health and Human Services. Miranda spoke to a Center counselor, Hager, and the social worker, then Hager spoke to D.W. privately.

Hager testified at trial regarding her interview of D.W.; the substance of that testimony is set forth in more detail in our analysis. Summarized, Hager testified regarding the procedure

used to interview D.W., but did not testify about what D.W. told her. Hager was cross-examined about her failure to administer an interview procedure intended to establish that a child knows the difference between the truth and a lie. On redirect examination, Hager explained that that procedure is only necessary when there is a concern that a child is lying, and Hager had no concerns during this interview that D.W. was not telling the truth.

Miranda was asked to consent to a search of the residence she shared with Archie, and Miranda signed a consent form. Miranda was also asked to take D.W. to an emergency room for examination. Miranda took D.W. and her other children to an emergency room, where they met Hager and a Center counselor.

Patricia Heser, a women's health nurse practitioner, was on duty at the hospital where D.W. was taken. Heser is certified as a "Sexual Assault Nurse Examiner." She interviewed D.W. and conducted an examination. Heser collected swabs of vaginal and anal secretions and saliva and took pictures of the opening of the vagina and the anal area. Heser said that there was "a little redness at one area around the vaginal opening" and "above her anus, on her back, there was [sic] a couple little abrasions." But there was no tearing, bruising, or scarring on D.W.'s vagina, and Heser agreed that D.W. was talkative, pleasant, and "acting like a normal child."

Heser testified that the redness between D.W.'s vagina and anus could have been caused by sexual penetration, but admitted on cross-examination that it could have been caused by "numerous things," including a fall. Similarly, although Heser testified that D.W.'s hymen was open, and could have been opened by sexual penetration, there were no tears or lacerations, and Heser admitted that a hymen can be open for several reasons, including rough play, a fall, or congenitally.

Dr. Jeffrey David, a private practice pediatrician with specialized training in child sexual abuse, volunteered at the Center. David examined D.W. on September 20, 2004. David's examination of D.W.'s genitals revealed nothing abnormal, except for a "nonspecific notch" on D.W.'s hymen that David said "you see in 20 percent of normal kids as well." David's examination of D.W.'s anus and perianal area revealed nothing abnormal. However, David testified that there are signs of physical injury

in less than 10 percent of verified cases of child sexual abuse. David said that one "rarely" sees tearing, trauma, or scarring on a person who claims to have been sexually assaulted and only occasionally sees bruising. David also testified that it was not normal for a 6-year-old girl to be bleeding from her vagina.

Dr. David examined the photographs that had been taken of D.W. in the emergency room on September 8, 2004. David testified that girls can injure their genital area by falling down, causing a "straddle injury," characterized by bruises to the skin and even abrasions or tears. However, David opined that there was no indication of a straddle injury in the emergency room photographs of D.W.

Officers of the Lincoln Police Department were assigned by Hager to go to Archie and Miranda's residence, arrest Archie, and search the residence. They took Archie into custody and searched the residence, while Miranda and the children were still at the hospital, looking for particular items Hager had directed them to find. Hager testified that she instructed police to look in Archie and Miranda's bedroom for items D.W. had described during the interview: a pair of young girls' underwear, a bottle of lotion, and tissues.

At trial, Miranda testified about several photographs taken of the inside of her residence by police during their search. In a photograph of the master bedroom, Miranda identified a bottle of white lotion on the dresser. Miranda testified that normally, that bottle of lotion had been kept on the ground floor of the residence, instead of upstairs in the bedroom. Miranda said she had first noticed that the lotion had been moved from downstairs on September 6, 2004, "the night [D.W.] mentioned to me about what had happened," 2 days before the search was conducted. The lotion was taken as evidence.

D.W.'s underwear, in which Miranda had seen what she believed to be bloodstains, was sitting on a shoe box in the master bedroom. Miranda testified that she had left the underwear in a laundry hamper near the bathroom but that Archie had told her he looked at the underwear and moved it to the bedroom. The underwear was taken as evidence.

A roll of toilet paper was on a bedside stand in the master bedroom. Miranda testified that it was not normal for a roll of

toilet paper to be beside the bed. A quantity of crumpled toilet paper was in a blue plastic basket, also sitting on the bedside stand. Miranda said that she had not seen the toilet paper on the bedside stand prior to September 6, 2004. She testified that on September 6, after she had seen stains in D.W.'s underwear,

> I was laying on this end of the bed . . . . I just noticed the toilet paper and some rolled up stuff. And, knowing what [D.W.] had told me, I picked up the paper and felt it, and it felt kind of hard. It did smell like lotion and it had blood on it.

Miranda said that she found the crumpled toilet paper on the front of the bedside stand, and she placed it in the blue basket where it was found by police. The officer conducting the search testified that there were two pieces of toilet paper, crumpled together, and that he seized them.

Hager interviewed Archie on September 8, 2004, in a police station interview room. Archie waived his rights under *Miranda v. Arizona*[3] and agreed to speak to police. A videotaped recording of the interview was played at trial.

In the interview, Archie initially expressed confusion about why he had been arrested. Hager asked if Archie knew where Miranda had taken D.W., and Archie indicated that Miranda had taken D.W. to the doctor because of the blood in her underwear. Archie claimed he was "the one who told [Miranda] to make her a doctor's appointment." Archie said that he did not know anything about how the blood got into D.W.'s underwear, other than what Miranda told him.

Archie initially denied awareness of the accusation that had resulted in D.W.'s August 19, 2004, visit to Dr. Anderson. Later, however, Archie recalled that Miranda had "said something about [D.W.] . . . that [D.W.] came to her and she talked to me and she said something about, uhm, a cover over the head or some shit. Something like that."

Archie claimed that D.W. lied about him, stating that

> she used to always tell me and my wife about [her uncle], uh, the daycare people, uh the, all these other people, the

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

little boys down the street, uh, the boy touched my pee pee, all this and that and half of the time it's come, from, from her ass growing up, she got problems about 2, 3:00 every morning . . . . She'd come and peak [sic] around the corner and watch us have sex.

Archie further explained that when he and Miranda first met, they sometimes had sex in the same room with D.W., although once they knew she was seeing them have sex, they tried to prevent her from seeing them.

Archie admitted that he used the lotion found in the bedroom and that his wife used lotion on the children. Archie also admitted that he put lotion on D.W., but that he did not put any on her genitals. Instead, he said, "I let her do that herself when she, when she use lotion I let her do that herself. I wash, I wipe their legs down with lotion and their arms. Any of their private parts on a female, I let her do that." Archie also discussed an incident in which D.W. had injured her "private area" while riding her bicycle, but stated that D.W. had blamed the injury on a boy down the street. Archie repeatedly denied sexually assaulting D.W.

Miranda testified that D.W. had never identified anyone other than Archie as having "sexed" her or made allegations about anyone else similar to those she had made about Archie. Miranda admitted that D.W. had said that Miranda's brother had "touched" her and that another girl at a daycare provider had "touched" her. However, the incident with Miranda's brother involved roughhousing during which D.W. had been injured, and was not sexual; nor had D.W. said the incident at daycare involved sexual touching. Hager testified that during the course of her investigation, she received no information from any other source indicating that D.W. had made accusations of other people sexually touching her, that D.W. had watched Archie and Miranda having sex, that D.W. had injured herself on her bicycle, or that Archie had encouraged Miranda to take D.W. to the doctor.

On September 23, 2004, Hager took oral swabs from Archie for DNA analysis. Those swabs were sent to the University of Nebraska Medical Center's human DNA identification laboratory, as were the sexual assault kit obtained from D.W., D.W.'s

underwear, and the crumpled pieces of toilet paper collected from Archie and Miranda's house. The laboratory tested samples of fabric from D.W.'s underwear, portions of the toilet paper, and the three swabs obtained from D.W. in the sexual assault kit. For each of the samples, an extraction procedure was used to separate sperm fractions from epithelial cells, the cells "that may be present on someone's skin or other mucosal surfaces such as the lips or the vagina."

Preliminary tests were conducted on each of the five items. In the preliminary tests, D.W.'s underwear and the toilet paper tested positive for blood. A preliminary semen test was inconclusive when performed on D.W.'s underwear and each of the swabs obtained from D.W. A second, confirmatory test for semen was performed on the swabs, and each test was negative. The toilet paper tested positive for semen in both tests.

Genetic profiles were detected on all five items. The samples from the vulva and anal swabs taken from D.W. and the samples from D.W.'s underwear were consistent with only D.W.'s DNA profile. The toilet paper contained a mixture of DNA consistent with Archie's and D.W.'s respective DNA profiles. In the epithelial fraction, Archie's DNA profile was detected in the mixture at all the tested genetic locations, and D.W.'s profile was detected at all the tested genetic locations except one. In the sperm fraction, only Archie's DNA profile was detected at all the genetic locations tested.

Probability statistics were generated for each of the genetic profiles obtained from the toilet paper sample. For the epithelial fraction, the probability of an individual unrelated to Archie or D.W. matching the DNA profile obtained was 1 in 4.87 million in the Caucasian population, 1 in 3.12 million in the African-American population, and 1 in 6.29 million in the American Hispanic population. For the sperm fraction, the probability of a DNA profile unrelated to Archie's matching the DNA profile obtained from the toilet paper sample was 1 in 13.6 septillion in the Caucasian population, 1 in 49.1 quintillion in the African-American population, and 1 in 308 sextillion for American Hispanics. The director of the laboratory opined, to a reasonable degree of scientific certainty, that the DNA profile that matched Archie's was from sperm within seminal fluid.

Archie was charged by information with one count of first degree sexual assault on a child[4] and one count of incest.[5] Archie entered pleas of not guilty to each count. Archie later filed a motion to withdraw his plea with respect to the count of incest, so that he could file a motion to quash that count on the basis that the incest statute[6] was unconstitutionally vague. The district court granted Archie's motion to withdraw his plea and overruled his motion to quash. Archie again pled not guilty to incest.

The case went to a jury trial. In addition to the evidence summarized above, D.W. testified at trial. When D.W. entered the courtroom, the court, without objection, introduced D.W. to the people in the courtroom and had her identify Archie.

The State began its examination of D.W. by asking several questions about the difference between the truth and a lie and about the identification of parts of the body. D.W. identified body parts correctly and indicated awareness of the difference between the truth and a lie. D.W. was then asked whether anyone had ever touched her to make her feel "mad or sad or angry," and D.W. said that Archie had touched her to make her mad.

D.W. explained that she had taken her pants off, because Archie "want[ed] to touch me." She identified the lotion found in the bedroom, and testified that Archie "[p]ut it on his — put it on his pee pee." D.W. said that after Archie applied the lotion to himself, he was "touching" her, with the lotion, on her "pee pee." Asked if it hurt, D.W. said, "[w]hen I go potty, it really hurt." D.W. also identified the roll of toilet paper in the photograph of the bedroom. D.W. said that Archie "wiped [the toilet paper] on my butt" when he was done touching her.

D.W. talked about how blood had come out of her "pee pee," and Miranda had discovered the blood on D.W.'s underwear when D.W. was taking a bath. D.W. said that "[m]y daddy said I can't tell my mom, 'cause he said I can't tell her if — I'd get a whooping." D.W. again identified Archie as the person of whom

---

[4] See § 28-319.

[5] See § 28-703(1).

[6] *Id.*

she was speaking, and she said that Archie had "whooped" her before and that it hurt and scared her.

D.W. was given a male and a female doll to reenact the incident. D.W. identified herself as the female doll and took the pants off the doll. D.W. asked, "Where are the covers?" and was given a piece of paper to be a cover. D.W. was asked, "Why did you put the cover on top of you?" and replied, "Because [Archie] didn't want me to see." D.W. took the pants off the male doll and positioned them together, then separated the dolls, with the male doll standing over the female doll.

On cross-examination, defense counsel questioned D.W. about talking to Miranda, in the following colloquy:

Q . . . And you talked to your mom before you came to court today?

A Yes. This is [what] my mom said, if — if I tell the truth, when I was really brave, I would go somewhere fun.

Q Oh, okay. So your mom told you to come to court today and tell us what you told us?

A Uh-huh (affirmative sound).

. . . .

Q And if you told us what you said today, she would take you someplace really fun?

A Uh-huh (affirmative sound).

Q Is that yes?

A That's a yes.

D.W. was asked about her conversations with the Center counselor, Hager, and the prosecutor, and D.W. answered affirmatively to some of the questions asking whether Hager and the prosecutor had told D.W. what to say in court. D.W. also stated that the prosecutor had, prior to her testimony, shown her the pictures she was shown in court. On redirect, D.W. clarified that Miranda, the Center counselor, and the prosecutor had all told D.W. to testify truthfully.

After D.W.'s testimony, the State rested, and Archie made a motion to dismiss both charges for failure to make a prima facie case. Archie specifically argued that there was insufficient evidence of sexual penetration and repeated his constitutional

claim. The motion was denied. Archie rested without adducing evidence and made a motion for directed verdict on the same grounds as his motion to dismiss, which was also denied.

The jury found Archie guilty on both counts. However, when the verdicts were presented to the court, the court noticed that the verdict form for the count of incest was defective, because the introductory paragraph incorrectly identified the ·charge as first degree sexual assault of a child, although the actual verdict lines correctly identified the charge as incest. The court explained the problem to the jury and asked the jury to confirm its verdicts, which it did. The jury was polled, and each juror indicated agreement with the verdicts. The court accepted the verdicts without objection.

Archie filed a motion for new trial, supported by two affidavits: one executed by Archie's mother and the other by a former spouse of Archie. The evidence adduced in support of the motion for new trial will be discussed in more detail below, but summarized, the affidavits averred that each affiant had been told, by Miranda, that the State had pressured Miranda to ensure that D.W. testified against Archie. Miranda testified at an evidentiary hearing and generally denied the allegations. The court overruled the motion for new trial, finding that the evidence did not support the allegations of witness or prosecutorial misconduct, or that a witness or prosecutor suborned perjury or interfered with Archie's right to a fair trial.

The matter proceeded to sentencing. The presentence investigation report indicated that Archie has a lengthy criminal history, including a 2000 conviction for attempted robbery. Archie was sentenced to a period of imprisonment of 25 to 30 years for first degree sexual assault on a child, and a concurrent term of imprisonment of 10 to 20 years for incest. Archie appeals.

## ASSIGNMENTS OF ERROR

Archie assigns, consolidated and restated, that the district court erred in (1) overruling his motion to quash and motion to dismiss because the incest statute is unconstitutionally vague; (2) permitting Hager to testify that she believed D.W. to be telling the truth during Hager's interview of D.W.; (3) introducing D.W. to the jury and directing D.W. to identify Archie in

the presence of the jury; (4) providing a verdict form that was confusing, misleading, and insufficient to support Archie's conviction because it was unclear and ambiguous; (5) overruling his motions to dismiss and for directed verdict on the basis of insufficient evidence; (6) overruling his motion for new trial; and (7) imposing excessive sentences.

■ Archie also argues that the district court erred in permitting George to testify that when asked what caused the blood in her underwear, D.W. blamed Archie. However, Archie did not assign this as error. An appellate court does not consider errors which are argued but not assigned.[7] Therefore, we do not consider this argument.

## STANDARD OF REVIEW

■ The constitutionality of a statute is a question of law, regarding which the Nebraska Supreme Court is obligated to reach a conclusion independent of the determination reached by the trial court.[8] The determination of a jurisdictional issue which does not involve a factual dispute is a matter of law which requires an appellate court to reach an independent conclusion.[9]

■ The exercise of judicial discretion is implicit in determinations of relevancy, and a trial court's decision regarding it will not be reversed absent an abuse of discretion.[10] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[11]

■ In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed

---

[7] *State v. King*, 272 Neb. 638, 724 N.W.2d 80 (2006).

[8] *State v. Marrs*, 272 Neb. 573, 723 N.W.2d 499 (2006).

[9] *State v. Bracey*, 261 Neb. 14, 621 N.W.2d 106 (2001).

[10] *State v. Stark*, 272 Neb. 89, 718 N.W.2d 509 (2006).

[11] *State v. Floyd*, 272 Neb. 898, 725 N.W.2d 817 (2007).

and construed most favorably to the State, is sufficient to support the conviction.[12]

■ In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.[13]

■ A sentence imposed within statutory limits will not be disturbed on appeal absent an abuse of discretion by the trial court.[14]

## ANALYSIS

### CONSTITUTIONALITY OF § 28-703

Archie contends that the court erred in overruling his various challenges to the constitutionality of the incest statute, § 28-703, which provides in relevant part that "any person who engages in sexual penetration with his or her minor stepchild commits incest," a Class III felony. Archie relies on the dissenting opinion in *State v. Johnson*[15] and argues that § 28-703 is unconstitutionally vague because it does not define the age of a "minor" stepchild.

In *Johnson*, the defendant was acquitted of first degree sexual assault of a child, but convicted of incest, based on alleged sexual acts between the defendant and his stepdaughter. The defendant admitted that he and his stepdaughter had sexual contact when she was 17 years old and sexual intercourse when she was 18 years old. The defendant's stepdaughter, however, testified that they had had sexual contact when she was 12 years old and that sexual intercourse started a year later.[16]

The defendant proposed that the jury be instructed that the stepchild must, as an element of the crime of incest, be less than 16 years old. The trial court, however, instructed the jury that as an element of the crime of incest, the stepchild must be less than 19 years old. The defendant was convicted of incest, and

---

[12] *State v. Gutierrez*, 272 Neb. 995, 726 N.W.2d 542 (2007).

[13] *Floyd, supra* note 11.

[14] *State v. Davlin*, 272 Neb. 139, 719 N.W.2d 243 (2006).

[15] *State v. Johnson*, 269 Neb. 507, 695 N.W.2d 165 (2005).

[16] See *id.*

he appealed, arguing in part that § 28-703 is unconstitutionally vague. The Nebraska Court of Appeals concluded as a matter of statutory interpretation[17] that the instruction given by the trial court was correct. We granted the defendant's petition for further review.[18]

This court was divided on the issue of whether § 28-703 is unconstitutionally vague. We agreed that because the defendant had failed to file a motion to quash in the trial court raising his constitutional claim, that issue could only be reached as plain error.[19] Four members of this court were of the opinion that the issue should be considered as plain error and that § 28-703 was unconstitutionally vague.[20] Three members of this court, however, declined to reach the issue and "[w]ithout deciding whether the statute is or is not unconstitutionally vague," concluded that "because the invalidity of the statute is not plainly evident, we cannot . . . consider the constitutionality of the statute where the defendant has failed to properly preserve the issue for appeal."[21] Because "[n]o legislative act shall be held unconstitutional except by the concurrence of five judges,"[22] the opinion of those three justices was the opinion of the court. The opinion further concluded, based upon statutory interpretation, that a "minor" for purposes of § 28-703 is a person under 19 years of age.[23]

In this case, Archie made his constitutional argument in the trial court and preserved it for appeal. He contends, based on the four-judge dissent in *Johnson*, that § 28-703 is unconstitutionally vague. However, Archie does not have standing to make this claim.

The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness

---

[17.] See Neb. Rev. Stat. § 43-2101 (Reissue 2004).

[18] See *Johnson, supra* note 15.

[19] See *id.*

[20] See *id.* (Gerrard, J., dissenting).

[21] *Id.* at 516, 695 N.W.2d at 173.

[22] Neb. Const. art. V, § 2.

[23] See *Johnson, supra* note 15.

that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.[24] To have standing to assert a claim of vagueness, a defendant must not have engaged in conduct which is clearly prohibited by the questioned statute and cannot maintain that the statute is vague when applied to the conduct of others.[25] Conduct which is clearly proscribed by the statute will not support a vagueness challenge (1) because the statute is not vague as to the party challenging the statute and (2) because the court will not examine the vagueness of the law as it might apply to the conduct of persons not before the court.[26] The test for standing to assert a vagueness challenge is the same whether the challenge asserted is facial or as applied.[27]

Here, there is little question that Archie's alleged conduct was clearly prohibited by the statute. Whatever the definition of a "minor stepchild" may be, it certainly includes a 6-year-old girl. Unlike *Johnson*,[28] the facts of this case do not present any ambiguity with respect to whether § 28-703 prohibits the conduct alleged. There is no merit to Archie's first assignment of error.

### HAGER'S TESTIMONY ABOUT INTERVIEW OF D.W.

Archie contends that the district court erred in permitting Hager to testify, over a relevance objection, that she had no concerns during her interview of D.W. at the Center that D.W. was not telling Hager the truth.

At trial, Hager testified at length about the procedures used to investigate family crimes and interview children. Hager said that as a member of the family crimes unit of the Lincoln Police Department, she had received specialized child forensic interview training. Hager explained there is a standard form for interviewing a child interviewee which begins with telling the child interviewee about the interview room and that the interviewer

---

[24] *State v. Faber*, 264 Neb. 198, 647 N.W.2d 67 (2002).

[25] *Id.*

[26] *State v. Hookstra*, 263 Neb. 116, 638 N.W.2d 829 (2002).

[27] *Faber, supra* note 24.

[28] *Johnson, supra* note 15.

is a police officer, and permitting the child interviewee to ask questions about those things. Then, the interviewer moves on to discussing a nonabuse event with the child interviewee, to "get the child used to the way we are going to talk." Hager said that after that,

> I'll move to what we call the ground rules, which include I'll say things such as if you don't understand, it's okay to say you don't understand. If I use a big word that you don't understand, just let me know. If you don't remember, it's okay to say that you don't remember.
>
> And also part of the ground rules is what we call the truth or lie ceremony. So it's a way to see if a child knows the difference and can understand the difference between the truth and a lie.
>
> And then we go into the part of the interview where we elicit information regarding the abuse event.
>
> And, after that, we close up usually with another non-abuse event . . . [s]o we end it in what we say is a positive note, to talk about something different.

Hager then testified specifically regarding her interview of D.W. at the Center. Hager agreed that during the course of the interview, she did not have any concerns that D.W. did not understand the difference between the truth and a lie. Although D.W. was "very energetic" and "couldn't sit still for very long," Hager testified that D.W. was able to provide information pertinent to the investigation.

However, Hager said that she departed from the standard sequence for interviewing a child during her interview of D.W. For example, Hager said she did not go through a "body part inventory" with D.W., because D.W. was already using terms to describe body parts and it was unnecessary to identify what D.W.'s terms meant. Hager also said that although she discussed the difference between a truth and a lie with D.W., she did not go through the truth-or-lie ceremony.

Hager was cross-examined regarding the truth-or-lie ceremony. Because it is significant to our analysis of this issue, an extensive section of defense counsel's colloquy with Hager is set forth below.

Q Why do you refer to the form during your interview with the child?

A Those are tools. . . .

Q Okay. And the truth [or] lie portion of the form is also to go over or to determine what?

A If it's age appropriate, meaning there's a certain age that I don't use that form with, that is to establish or to see if they can tell the difference between the truth and a lie.

Q Okay. And you said earlier that you didn't go over this form with [D.W.] before your interview did you?

A Yes.

Q So you did not use the truth/lie part with her when you questioned her, is that right?

A Correct. That form, I did not.

. . . .

Q . . . You testified earlier that you've done a series of child forensic interviews in your profession, is that right?

A Yes.

Q And you were specially trained to question children?

A Yes.

Q All right. And you mentioned something yesterday, you need to make sure, when you're questioning a child, not to mislead, is that right?

A Yes.

Q Because that can be a problem in these kind[s] of cases, can it not?

A When interviewing children, yes, that can be a problem.

. . . .

Q — an idea may be planted in a child's head, inadvertently, by a questioner?

A Can it be?

Q Yes.

A Yes.

Q Okay. Or a child may give a positive response that they suspect maybe the questioner is asking for, is that right?

A Yes, that's possible.

Q And that's why you have the protocols to determine the truth and lie, make sure a child understands the difference between the truth and lie before you do an interview, is that right, at least part of the reason?

A As part of the interview, we sometimes use that tool, yes.

On redirect examination, the State revisited the subject of the truth-or-lie ceremony. Hager testified that the documents about which she had been questioned were "five separate tools" that might or might not be used in a particular instance. Hager explained that "[i]t all depends upon the age of the child and their [sic] disposition, as far as the interview." Hager said she had spoken to D.W. about the importance of telling her the truth. Hager testified over a relevance objection that she had no concerns D.W. was not telling her the truth and agreed that it was only "at times, when you have children where you may have those concerns [about telling the truth], that's when you definitely need to go through the format of the truth and lie ceremony."

Archie argues, based on *State v. Beermann*,[29] that Hager gave improper testimony as to the credibility of another witness. In *Beermann*, the 10-year-old alleged victim of a sexual assault testified, at trial, regarding five sexual assaults committed by the defendant. Issues were raised regarding inconsistency between the alleged victim's trial testimony and the testimony she gave at a preliminary hearing. Following her trial testimony, the county sheriff's deputy who had investigated the allegations was asked if he had heard the alleged victim's in-court testimony, and he said he had. The deputy testified that the alleged victim's in-court testimony was consistent with what he had been told during the investigation. The deputy was then asked if, based upon his training and experience and his observations of the victim, he had an opinion whether or not the alleged victim had been sexually abused. The deputy testified it was his opinion that the alleged victim had been sexually abused.[30]

---

[29] *State v. Beermann*, 231 Neb. 380, 436 N.W.2d 499 (1989).

[30] See *id.*

On appeal, this court concluded that the testimony had been erroneously admitted, in part based on the principle that "it is totally improper for one witness to testify as to the credibility of another witness."[31] We found that the testimony was precluded by Neb. Evid. R. 701 and 702,[32] because there was no evidence that the deputy was an expert on the subject of his testimony, and the subject was not proper for lay opinion testimony because "'it tended to usurp the jury's role.'"[33] We held that the credibility of a witness is left to the jury's judgment and that "'"[n]o witness, expert or otherwise, should be permitted to give an opinion that another mentally and physically competent witness is telling the truth."'"[34]

Archie also relies on the Court of Appeals' opinion in *State v. Doan*.[35] In *Doan*, an appeal from a conviction for sexual assault of a child, the State presented expert testimony from a counselor who had treated the alleged victim. The counselor testified to the characteristics typically seen in sexually abused children and that part of her function was to evaluate "'whether or not I believe they've been abused or not.'"[36] The counselor testified about the history she obtained from the alleged victim and described the alleged victim's physical appearance and reactions while the alleged victim described the abuse to the counselor. The counselor concluded that she had received "validation" of the alleged abuse.[37]

The Court of Appeals, noting our holding in *Beermann*, concluded that the opinion testimony should have been excluded for lack of proper foundation. The court found "no showing" that the counselor "had the underlying expertise to validate

---

[31] *Id.* at 396, 436 N.W.2d at 509.

[32] Neb. Rev. Stat. §§ 27-701 and 27-702 (Reissue 1995).

[33] *Beermann, supra* note 29, 231 Neb. at 396, 436 N.W.2d at 509.

[34] *Id.*, quoting *State v. Romero*, 147 Wis. 2d 264, 432 N.W.2d 899 (1988). Accord *State v. Smith*, 241 Neb. 311, 488 N.W.2d 33 (1992).

[35] *State v. Doan*, 1 Neb. App. 484, 498 N.W.2d 804 (1993).

[36] *Id.* at 488, 498 N.W.2d at 807.

[37] See *id.*

[the] account of sexual abuse, even if such testimony could be received, which it cannot."[38] The court held that "in a prosecution for sexual assault of a child, an expert witness may not give testimony which directly or indirectly expresses an opinion that the child is believable, that the child is credible, or that the witness' account has been validated."[39]

More recently, in *In re Interest of Kyle O.*,[40] the Court of Appeals addressed a situation in which a 14-year-old defendant was convicted of sexual contact with a 5-year-old alleged victim. The defendant argued that the trial court erred in excluding a letter from the defendant's counselor. The Court of Appeals noted that the letter contained the opinion of the counselor that the defendant was telling the truth in denying the allegations. The Court of Appeals, citing *Beermann*, concluded that the trial court did not abuse its discretion by excluding the letter, because the opinion of the counselor regarding the defendant's credibility was irrelevant.[41]

The circumstances of the instant case, however, are distinguishable from those presented in *Beermann*, *In re Interest of Kyle O.*, and *Doan*. In this case, Hager did not purport to offer an expert opinion as to D.W.'s credibility. Hager's statement consisted of one question and one answer, in which Hager agreed that she did not have "any concerns that [D.W.] wasn't telling [her] the truth." The question and answer were obviously in the context of explaining on redirect examination why Hager did not utilize the truth-or-lie ceremony with this particular child witness. Nonetheless, it is improper for a prosecutor to inquire of a witness whether another person may or may not have been telling the truth in a certain instance. The proper line of inquiry, as was expressed on direct examination, is whether Hager had concerns regarding D.W.'s ability to "understand the difference between the truth and a lie." Hager testified on direct examination that D.W. understood that difference.

---

[38] *Id.* at 496, 498 N.W.2d at 812.

[39] *Id.*

[40] *In re Interest of Kyle O.*, 14 Neb. App. 61, 703 N.W.2d 909 (2005).

[41] See *id.* See, also, *State v. Egger*, 8 Neb. App. 740, 601 N.W.2d 785 (1999).

██ Based on our review of the entire record and the context in which the line of inquiry came about, however, we conclude that Hager's statement did not materially influence the jury in a verdict adverse to the defendant. Harmless error exists in a jury trial of a criminal case when the court makes an erroneous evidentiary ruling which, on review of the entire record, did not materially influence the jury in a verdict adverse to the defendant.[42] Any error in permitting Hager's statement on redirect examination was harmless beyond a reasonable doubt.[43]

In this case, Hager had been cross-examined in depth regarding her decision not to administer the truth-or-lie ceremony to D.W. The evident implication of Archie's cross-examination was that because Hager departed from established protocol, she might have misled D.W., suggested the "right" answers to questions, or even planted ideas in D.W.'s head. This was a legitimate line of inquiry on cross-examination, but by challenging the basis for Hager's departure from the interrogation form, the cross-examination implicated Hager's assessment of whether D.W. understood the concept of telling the truth during the interview. Here, while the form of the question posed to Hager on redirect examination was improper, we must examine the entire context of questioning when assessing prejudice.

██ Unlike the circumstances presented in *Beermann*, *In re Interest of Kyle O.*, and *Doan*, in this case, Hager did not testify to the substance of D.W.'s own statements or offer expert opinion testimony on the credibility of those statements. Instead, Hager answered a single question during redirect examination that was related to an issue raised by Archie during cross-examination. Read in context, the effect of Hager's single statement was not to vouch for the credibility of a witness, but simply to explain why she departed from the standard interview form in her interview of D.W. In a harmless error review, we look at the evidence upon which the jury rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather,

---

[42] See *State v. McKinney, ante* p. 346, 730 N.W.2d 74 (2007).

[43] See *id.*

whether the guilty verdict rendered in the trial was surely unattributable to the error.[44] Considering the context in which Hager's statement was made and based on our review of the entire record, we conclude that the guilty verdict rendered in this trial was surely unattributable to any error in permitting this statement on redirect and that such error was harmless beyond a reasonable doubt.

### INTRODUCTION OF D.W. TO JURY

Archie claims that the district court committed plain error when, before D.W. testified, the court introduced D.W. to the people in the courtroom and directed her to identify Archie.

Prior to D.W.'s testimony, before the jury entered the courtroom, the court and counsel discussed how the court would proceed with D.W.'s testimony. The court explained:

[D.W.] is seven years old. What I would propose to do is, when she comes in, introduce myself to her and explain to her who everybody else in the well is.

I would just say you know who . . . Archie is, if that's not objectionable to [defense counsel]. If that is — I would just say the other people sitting at these tables in suits are attorneys, and they may ask you some questions, let her know who the jurors are and just tell her that they're just going to be listening to what's going on, to what she has to say, who my court reporter is, who I am. And that's it.

And I may just say that the people sitting in the back are people who come in and watch what's going on in courtrooms.

And then what I may very well do is . . . I may ask [the prosecutor] to put something on the monitor there, just a piece of paper that I have, just a blank piece of paper there, one of those pieces of paper that I have in front, just so she knows that he may put things there and she'll be able to see them on her monitor here, and just — then I will ask her — and I'm willing — And then I would ask her what we talked about the other day, telling the difference between telling the truth and telling a lie and good or bad and promise to tell the truth.

---

[44] *Id.*

> But I think it's kind of important that she feel that she knows who the players are in the courtroom, coming into a courtroom now. I know she's been in the courtroom before, empty. I think it's different when you come and you see a lot of people, that at least she knows who's here.

The court asked both the State and Archie if they had any objection to this procedure, and both parties affirmatively stated that they had no objection.

The jury was brought into the courtroom, and before D.W. entered, the court explained to the jury the process that would be followed. The court explained, "I just wanted you to know that that's what I'm going to do, because she's a seven-year-old girl." However, the court also instructed the jury at that time that "[D.W.'s] testimony has to be treated just the same as anybody else's testimony. No deference is given to her because she's a seven-year-old girl. I'm just trying to make her feel a little bit more comfortable in this strange environment."

After D.W. entered the courtroom and took the stand, the court generally followed the procedure it had explained to the parties and the jury. The court specifically directed D.W.'s attention to the five people seated at the defendant's table, and asked D.W., "One of them you know, and that's . . . Archie, right?" D.W. nodded, and when prompted by the court to speak aloud, answered, "Yes."

Although Archie complains about this procedure on appeal, he did not object at trial, even after being expressly invited to do so. In the absence of plain error, when an issue is raised for the first time in an appellate court, the issue will be disregarded inasmuch as the trial court cannot commit error regarding an issue never presented and submitted for disposition in the trial court.[45] Consideration of plain error occurs, of course, at the discretion of an appellate court,[46] and the scope of our review is obviously limited by an appellant's failure to raise an argument in the trial court.

Archie contends the court committed plain error, as it was "prejudicial for the court to overly accommodate and to

---

[45] *State v. Robinson*, 272 Neb. 582, 724 N.W.2d 35 (2006).

[46] *State v. Al-Zubaidy*, 257 Neb. 935, 602 N.W.2d 8 (1999).

personalize .himself to a witness in a criminal case."[47] Archie argues that the court's conduct "implicitly communicated that this child needed to be treated tenderly as a victim" and this "validated" the State's theory that D.W. had been sexually assaulted.[48] Archie also argues that the court erred by instructing D.W. to identify Archie in the courtroom before her testimony.

We disagree with Archie's characterization of the court's accommodation of D.W.'s testimony. The court's procedure did not show undue favoritism toward D.W.; rather, the court simply recognized that D.W. was a 7-year-old child who might be unfamiliar with, and intimidated by, a courtroom setting. The trial court has broad discretion over the general conduct of trial.[49] The court must also exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence, so as to make the interrogation and presentation effective for the ascertainment of the truth.[50] A trial court has wide discretion in fashioning procedures and modifying standard trial practices to accommodate the special needs of child witnesses. Recognizing the difficulties a particular child may face in trying to testify in a traditional courtroom setting, a judge may require that the environment in which a witness is to give testimony may be made less formal and intimidating.[51]

The district court in this case exercised its discretion to help D.W. testify truthfully without being overwhelmed by her surroundings. As described above, the court carefully explained to the jury what it was doing and why it was being done and instructed the jury that D.W.'s testimony should be treated the same as the testimony of any other witness. Absent evidence to the contrary, it is presumed that a jury followed the instructions

---

[47] Brief for appellant at 24.

[48] *Id.*

[49] See *State v. Gales*, 269 Neb. 443, 694 N.W.2d 124 (2005), *cert. denied* 546 U.S. 947, 126 S. Ct. 449, 163 L. Ed. 2d 341.

[50] Neb. Evid. R. 611(1)(a), Neb. Rev. Stat. § 27-611(1)(a) (Reissue 1995).

[51] See, *Commonwealth v. Amirault*, 404 Mass. 221, 535 N.E.2d 193 (1989); John E.B. Myers & Nancy W. Perry, Child Witness Law and Practice § 7.4 (1987 & Cum. Supp. 1992).

given in arriving at its verdict.[52] There is no indication that the jury failed to respect its instruction here and no plain error apparent in the court's procedure.

### INCEST VERDICT FORM

Archie assigns error to the verdict form for the count of incest. Following the jury instructions, the case was submitted to the jury, and it found Archie guilty on both counts. However, when the verdicts were presented to the court, an issue arose with respect to the verdict form for the count of incest. At the jury instruction conference, the court had provided the parties with drafts of the verdict forms for each count of the information and the parties agreed that the verdict forms were acceptable. However, the verdict form for the count of incest was later found to be defective. Below the caption, the form incorrectly read: "**We, the Jury,** duly impaneled and sworn in the above-entitled cause, do, with respect to the charge of First Degree Sexual Assault of a Child . . . find as follows . . . ." Below that, the form correctly provided the jury with the options of finding Archie "**Guilty** of Incest," "**Guilty** of Attempted Incest," or "**Not Guilty.**"

The court noticed the mistake when the bailiff was reading the verdict for the count of incest. The court told the jury:

> We can only read these things for so many times. With first degree sexual assault, find guilty of incest. This is a typographical error, obviously. It says incest. I'm going to have [the bailiff] read it as it says. It says guilty of incest.
>
> Then I'm going to ask them, notwithstanding the . . . differences in what it says, whether in fact the verdict is for guilty of the charge of incest.

The court asked if that procedure was agreeable to the parties, and the parties indicated that it was. The court informed the jury of the mistake, calling it a "scrivener's error," and admitted it was the court's "mistake for not catching that." The court asked the jury, with respect to the count of first degree sexual assault on a child, whether the verdict of guilty was its unanimous verdict, and it indicated it was. The court then asked the jury

---

[52] *State v. Iromuanya,* 272 Neb. 178, 719 N.W.2d 263 (2006).

with respect to the verdict form for the count of incest, "which has the box checked, 'Guilty of incest,' notwithstanding the fact that the body says, the very introduction says first degree sexual assault of a child, it says incest, guilty of incest, is this your unanimous verdict?" All the jurors indicated that it was. The jury was polled, and each juror indicated agreement with the verdicts.

▮▮▮ Archie now claims that he was prejudiced by the erroneous verdict form. However, objections to the verdict form should be made at the jury instruction conference or at the time the verdict is returned.[53] Archie concedes that our review of this issue is for plain error. There is no question that the verdict form contained an error. The issue, then, is whether that error was so prejudicial that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process.[54]

We have reviewed the record and examined the verdict forms, and based on that review and observation of the forms, we are convinced that the erroneous verdict form did not mislead the jury and that the verdicts rendered accurately reflected the jury's actual determination of Archie's guilt of both offenses. No plain error is present, and we reject Archie's fourth assignment of error.

### SUFFICIENCY OF EVIDENCE

Archie argues that the evidence is insufficient to sustain his convictions. First, Archie argues generally that the evidence lacks the probative force to support a finding of guilt. Archie suggests that D.W.'s injuries might have been inflicted by an ordinary childhood accident, that D.W.'s testimony was tainted by suggestions from Miranda and the State, and that the DNA sample on the toilet paper was contaminated because the two pieces of toilet paper were collected and stored together.

---

[53] *Bradley T. & Donna T. v. Central Catholic High Sch.*, 264 Neb. 951, 653 N.W.2d 813 (2002).

[54] See *State v. Mata*, 266 Neb. 668, 668 N.W.2d 448 (2003), *cert. denied* 543 U.S. 1128, 125 S. Ct. 1088, 160 L. Ed. 2d 1081 (2005).

■ However, the credibility and weight of witness testimony are for the jury to determine, and witness credibility is not to be reassessed on appellate review.[55] The evidence conflicted on how D.W.'s injuries were likely to have been inflicted, and D.W. directly stated that she was injured by Archie. Archie argued to the jury that D.W.'s testimony was unreliable, but the jury obviously found her testimony credible. The evidence does not support Archie's argument that the toilet paper sample was contaminated—rather, the record indicates that the two pieces of toilet paper were crumpled together when they were found and that they were taken as evidence and retained in the same condition in which they were found. In short, taken in the light most favorable to the State, the evidence summarized above is sufficient to support Archie's convictions.

Archie specifically argues that even if the evidence is sufficient to establish sexual contact, there is not enough evidence to support a finding that he subjected D.W. to sexual penetration. At the time the offenses were allegedly committed, § 28-319(1) provided, in relevant part, that "[a]ny person who subjects another person to sexual penetration . . . (c) when the actor is nineteen years of age or older and the victim is less than sixteen years of age is guilty of sexual assault in the first degree." Similarly, pursuant to § 28-703(1), "any person who engages in sexual penetration with his or her minor stepchild commits incest." We note that § 28-319 was significantly amended effective July 14, 2006,[56] but that amendment is not applicable to this proceeding.

■ Obviously, pursuant to §§ 28-319(1) and 28-703, sexual penetration is an element of both offenses, and the jury was so instructed. The jury was also correctly instructed that

> [s]exual penetration means sexual intercourse in its ordinary meaning, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the actor's or victim's body or any object manipulated by the actor into the genital or anal openings of the victim's body which

---

[55] *Robinson, supra* note 45. See, also, *State v. Faust*, 269 Neb. 749, 696 N.W.2d 420 (2005); *State v. Earl*, 252 Neb. 127, 560 N.W.2d 491 (1997).

[56] See 2006 Neb. Laws, L.B. 1199.

can be reasonably construed as being for nonmedical or nonhealth purposes. Sexual penetration shall not require emission of semen.[57]

The slightest intrusion into the genital opening is sufficient to constitute penetration, and such element may be proved by either direct or circumstantial evidence.[58] It is not necessary that the vagina be entered or that the hymen be ruptured; the entry of the vulva or labia is sufficient.[59]

Archie argues that D.W. did not testify directly to sexual penetration. However, taken in the light most favorable to the State, the evidence is sufficient to establish that sexual penetration occurred. The physical examinations of D.W., D.W.'s testimony, and the blood found on D.W.'s underwear and the toilet paper taken from Miranda and Archie's house are indicative of an injury resulting from sexual penetration. This evidence is sufficient to support the jury's conclusion that Archie subjected D.W. to sexual penetration.[60]

We find sufficient evidence in the record to support the jury's findings. Archie's assignment of error is without merit.

## MOTION FOR NEW TRIAL

Archie contends that the district court erred in overruling his motion for new trial based on alleged witness and prosecutorial misconduct. Before the jury instruction conference, Archie made a motion for mistrial, based on information obtained from Archie's mother, who claimed that she had been contacted by Miranda. According to Archie's mother, Miranda told her that the State had threatened Miranda that unless D.W. had testified the way she did in court, the State would take Miranda's children away from her. The court overruled the motion for mistrial, noting that the issues presented could, if necessary, be raised through a motion for new trial. After conviction, Archie filed a motion for new trial based on the same allegations,

---

[57] Neb. Rev. Stat. § 28-318(6) (Cum. Supp. 2004).

[58] See *State v. Hirsch*, 245 Neb. 31, 511 N.W.2d 69 (1994).

[59] *Id.*

[60] Compare *id.*

supported by two affidavits: one executed by Archie's mother, Paulette Archie, and the other by Lisa Merriweather, a former spouse of Archie. ·

Paulette averred that she had regular contact with Miranda during the pendency of the case ·and had spoken with Miranda about D.W.'s accusations against Archie. Paulette claimed that following D.W.'s in-court testimony, Paulette and Miranda spoke about the trial, Miranda's testimony, and D.W.'s testimony. Paulette averred that

> [d]uring our conversations, [Miranda] told me that she had been threatened by . . . the state to bring [D.W.] to court and to compel [D.W.] to testify against [Archie] in the manner that [D.W.] did. Further, [Miranda] told me that if she failed to bring [D.W.] to court and to compel [D.W.] to testify in the manner that she did . . . the state threatened to remove [Miranda's] children from her care.

Paulette further stated that Miranda had told Paulette that she had not told the truth during her testimony, instead saying what the prosecutor wanted her to say, but that if questioned by authorities, she would deny what she had said to Paulette.

Similarly, Merriweather averred that she visited Miranda's home approximately 3 weeks after the jury had found Archie guilty and that she and Miranda had discussed the case, Miranda's testimony, and D.W.'s testimony. Merriweather stated that "[d]uring our conversation, [Miranda] told me that she had been threatened by a Brian from Child Protective Services that if she failed to cooperate with the State and did not bring [D.W.] to court, the State could remove her children from her care and/or charge her with child neglect."

On Archie's motion, the court ordered an evidentiary hearing on the allegations set forth in the affidavits. Miranda testified that she spoke with Paulette briefly at the courthouse, on the day that D.W. testified, and spoke with Paulette at home "[a] couple days later," when Paulette came to Miranda's home to pick up Archie's son for a visit. Miranda denied speaking to Paulette about the case on those occasions. Miranda specifically denied making any of the statements attributed to her in Paulette's affidavit.

Miranda admitted she had spoken to Merriweather at around the time Merriweather had claimed. Miranda denied that she and Merriweather conversed about Archie's trial, stating instead that "[s]he talked to me about it" and Miranda "just answered her questions." Miranda said the "question and answer conversation" lasted for 45 minutes to an hour. Miranda denied making the statement attributed to her in Merriweather's affidavit.

Miranda testified that she had told Merriweather, " 'I'm lying, I'm lying,' " sarcastically, in response to Merriweather's accusing Miranda of being a liar. Miranda said that she did that "because I just wanted to have her hear what she wanted to hear, I guess." Miranda said that Merriweather had been accusative and had raised her voice. Miranda testified that initially, she insisted to Merriweather that she was telling the truth, but she finally just gave up and told Merriweather that Merriweather was right. According to Miranda, Merriweather called Miranda a liar "[a] lot," and Miranda sarcastically replied, "[l]ike, I'm a liar, like, yeah, I'm lying, like that, yeah."

The court overruled the motion for new trial. After reciting the evidence in detail, the court found that the evidence did not support the allegations of witness or prosecutorial misconduct.

 A new trial, after a verdict of conviction, may be granted, on the application of the defendant, for "misconduct of the jury, of the prosecuting attorney, or of the witnesses for the state" materially affecting the defendant's substantial rights.[61] A trial judge is accorded significant discretion in granting or denying a motion for new trial, because the trial judge sees the witnesses, hears the testimony, and has a special perspective on the relationship between the evidence and the verdict.[62] When the granting of a new trial requires a consideration of conflicting evidence, the findings of the trial court thereon will not ordinarily be disturbed on appeal.[63]

In this case, the district court was presented with starkly conflicting evidence from individuals with different interests in

---

[61] Neb. Rev. Stat. § 29-2101(2) (Cum. Supp. 2006).

[62] *Springer v. Bohling*, 263 Neb. 802, 643 N.W.2d 386 (2002).

[63] *Hartley v. Guthmann*, 248 Neb. 131, 532 N.W.2d 331 (1995).

the outcome of the proceedings. The court's order demonstrates that it carefully considered that evidence before overruling the defendant's motion for new trial. Miranda testified before the district court that the allegations in the affidavits were false, and the court specifically found that Miranda's testimony was credible and that Miranda did not influence D.W.'s trial testimony. Because these findings are supported by the evidence, the district court did not abuse its discretion in overruling Archie's motion for new trial.

### EXCESSIVE SENTENCES

Archie argues that his sentences, of 25 to 30 years' imprisonment for first degree sexual assault of a child, and a concurrent term of 10 to 20 years' imprisonment for incest, were excessive. Archie argues that the district court failed to properly consider that Archie had no prior sexual offenses and that a sexual adjustment inventory test administered to Archie showed no established pattern of sexual interest in children.

However, as previously noted, a sentence imposed within statutory limits will not be disturbed on appeal absent an abuse of discretion by the trial court.[64] First degree sexual assault on a child is a Class II felony,[65] punishable by a minimum of 1 year's imprisonment and a maximum of 50 years' imprisonment.[66] Incest is a Class III felony,[67] punishable by a minimum of 1 year's imprisonment and a maximum of 20 years' imprisonment, a $25,000 fine, or both.[68] The sentences imposed in this case were clearly within the statutory limits.

When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the

---

[64] *Davlin, supra* note 14.

[65] § 28-319(2).

[66] Neb. Rev. Stat. § 28-105(1) (Cum. Supp. 2006).

[67] § 28-703(2).

[68] § 28-105(1).

amount of violence involved in the commission of the crime.[69] When a sentence imposed within statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying these factors as well as any applicable legal principles in determining the sentence to be imposed.[70]

A review of Archie's criminal record reveals a long history of lawbreaking and violence, particularly domestic violence, and the testimony at trial also evidences Archie's propensity for violence.[71] Moreover, the transcript of Hager's interview of D.W., present in the presentence investigation report, contains ample proof of the pain and fear Archie inflicted on D.W. by beating and sexually abusing her. Sexual assault on a child is a serious and deplorable crime, and the injury that results from this type of assault is well established.[72] The record also indicates that Archie subjected D.W. to sexual abuse on more than one occasion. Based on our review of the record, we conclude that the district court did not abuse its discretion in sentencing Archie, and we reject his final assignment of error.

## CONCLUSION

For the foregoing reasons, we find no merit to Archie's assignments of error. The judgment of the district court is, therefore, affirmed.

AFFIRMED.

HEAVICAN, C.J., not participating.

---

[69] *Marrs, supra* note 8.

[70] *State v. Vasquez,* 271 Neb. 906, 716 N.W.2d 443 (2006).

[71] Compare *State v. Freeman,* 267 Neb. 737, 677 N.W.2d 164 (2004).

[72] See, *State v. Meers,* 257 Neb. 398, 598 N.W.2d 435 (1999); *State v. Andersen,* 232 Neb. 187, 440 N.W.2d 203 (1989); *State v. Davis,* 1 Neb. App. 502, 500 N.W.2d 852 (1993).